## TEXAS CO. v. RAMSOWER et al.
### (No. 1048–4082.)

Commission of Appeals of Texas, Section A. Feb. 29, 1928.

**1. Mines and minerals ⬅️78(1)—Oil lease implies covenant of protection against drainage by drilling offset wells.**

Oil lease not expressly providing for protection from drainage by wells on adjacent lands implies covenant of protection by drilling offset wells in addition to what is expressly provided for in instrument.

**2. Mines and minerals ⬅️78(1)—Whether offset wells should be drilled depends on what average man would do, not on lessee's good-faith judgment, though expert.**

Lessee's judgment, exercised in good faith, is not determinative of question whether given conditions require drilling of offset wells; standard of conduct being what is reasonable, that is, supposed conduct of average man, as "the man on the spot" may be negligent or otherwise fall short of what circumstances require, though he is expert and uses his best judgment.

**3. Contracts ⬅️253—Novation ⬅️7—Concurrence of two minds is required to set aside or novate contract.**

Burdens of contract, in which mutuality is essential, cannot be rendered innocuous as to covenantor and covenantee's rights practically defeated at covenantor's will, but contract can be set aside or novated only by concurrence of two minds.

**4. Mines and minerals ⬅️78(1)—Payment of stipulated rental in lieu of drilling oil well held not to relieve lessee from liability for damages by failure to drill offset wells.**

Lessee's payment of stated sum as rental for privilege of deferring commencement of well, pursuant to stipulation in oil lease, held not to relieve lessee from liability for damages from drainage by wells on adjacent lands before expiration of extended time; such stipulation referring to prospecting or developing well, not implied covenant of protection against drainage by drilling offset wells.

**5. Mines and minerals ⬅️78(1)—Lessor's acceptance of stipulated rentals in lieu of drilling held not to preclude recovery of damages for failure to drill offset wells.**

Lessor's acceptance of rentals becoming due under oil lease, because of lessee's failure to drill wells, held not to preclude recovery of damages for breach of lessee's implied covenant to drill wells to offset drainage by wells on adjacent lands.

**6. Mines and minerals ⬅️78(4)—Lessor's right to rescind oil lease at due date of rental, payable in lieu of drilling, for breach of implied covenant to drill offset wells, would require election to rescind or affirm contract at that time.**

If lessor had right to rescind oil lease at due date of rental, payable in lieu of drilling operations, because of prior breach or repudiation of implied covenant to drill offset wells, its existence put her to election between rescission and affirmance of contract at such time.

**7. Mines and minerals ⬅️78(5)—Lessor's receipt of rental in lieu of drilling was evidence of election not to rescind oil lease for failure to drill offset wells, but bound her only as to election between inconsistent rights.**

Lessor's receipt of money, tendered as rental in lieu of drilling operations, pursuant to stipulation in oil lease, was evidence of election to affirm contract, instead of rescinding it for prior breach of implied covenant to drill offset

---

⬅️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

wells, but bound her only as to election between inconsistent rights and remedies.

**8. Mines and minerals ☞78(1)—Affirmance of oil lease, as by accepting rental in lieu of drilling, waives claim for damages by failure to drill offset wells only when clearly so intended.**

Waiver, as of lessor's claim for damages by breach of implied covenant of oil lease to drill offset wells, is largely a question of intent, and mere acts of affirmance of contract, as by accepting rental in lieu of drilling operations after such breach, amount to waiver only when done with clearly manifested intention to abide by contract and waive all right to damages; acts themselves not being evidence of such intention.

**9. Appeal and error ☞216(1)—Failure to instruct on measure of damages is not reviewable, in absence of presentation of charge on subject.**

Where defendant did not prepare and present for submission a charge on measure of damages, but merely requested a charge on the law of the case, assignment of error in not instructing jury on measure of damages presents nothing for review.

**10. Appeal and error ☞989—Question on writ of error is not weight or preponderance of evidence, but whether matters found by jury were issuable.**

Question on writ of error to Supreme Court is, not weight or preponderance of evidence, but whether matters found by jury were issuable.

**11. Mines and minerals ☞78(7)—Drainage of leased premises, and amount thereof, held for jury in action for breach of implied covenant to drill offset wells.**

Questions of drainage of leased premises by oil wells on adjacent lands, and amount thereof, *held* for jury in lessor's action for breach of lessee's implied covenant to drill offset wells.

**12. New trial ☞35—Refusal of new trial because of leave granted plaintiff after close of evidence and departure of defendant's witnesses, to offer additional testimony, held not abuse of discretion, in absence of showing that other rebuttal witnesses could not have been secured within time given.**

Refusal of new trial because of leave, granted plaintiff after close of evidence and departure of defendant's witnesses, to offer testimony as to market value of oil in action for damages by lessee's failure to drill offset wells, *held* not abuse of discretion, in absence of showing that other rebuttal witnesses could not have been secured, pursuant to court's offer to give time therefor, where case was tried in heart of oil field.

**13. Trial ☞68(2)—Trial judge has broad discretion as to reopening case before conclusion of argument (Rev. St. 1925, art. 2181).**

Broad discretion touching reopening of case at any time before conclusion of argument is vested in trial judge by Rev. St. 1925, art. 2181 (Rev. St. 1911, art. 1952).

**14. New trial ☞35—Refusal of new trial because of leave, granted after close of evidence and departure of defendant's witnesses, to offer additional testimony, held not abuse of discretion, in view of showing as to what such witnesses would have testified.**

Refusal of new trial because of leave, granted plaintiff after close of evidence and departure of defendant's witnesses, to offer testimony as to market value of oil in action for damages by lessee's failure to drill offset wells, *held* not abuse of discretion, where testimony of defendant's counsel showed that such witnesses would have contributed substantial amount of evidence as to values against defendant and would not have contradicted plaintiff's testimony as to values in one important month, and conflict in testimony, as to other periods would have been slight.

**15. New trial ☞35—Refusal of new trial because of leave, granted after close of evidence and departure of defendant's witnesses, to offer additional testimony, held not abuse of discretion, in view of imputed knowledge of possibility of reopening case (Rev. St. 1925, art. 2181).**

Refusal of new trial because of leave, granted after close of evidence and departure of defendant's witnesses, to offer testimony as to market value of oil in action for damages by lessee's failure to drill offset wells, *held* not abuse of discretion; such witnesses being excused with imputed knowledge of possibility that case might be reopened before conclusion of argument under Rev. St. 1925, art. 2181 (Rev. St. 1911, art. 1952).

**16. New trial ☞35—That defendant's witnesses could have disclosed relevant fact not referred to in plaintiff's evidence, offered by leave granted after departure of defendant's witnesses, held not to warrant new trial.**

That defendant's witnesses could have disclosed amount of oil produced from certain well, to which new testimony, offered by plaintiff by leave granted after close of evidence and departure of defendant's witnesses, made no reference, *held* not to warrant new trial; such amount being relevant matter inviting disclosure throughout introduction of defendant's original testimony.

Error to Court of Civil Appeals of Eighth Supreme Judicial District.

Action by Mrs. L. A. Ramsower, for herself and as surviving community administratrix, and others, against the Texas Company. A judgment for plaintiffs was reformed and affirmed as reformed by the Court of Civil Appeals (255 S. W. 466), and defendant brings error. Affirmed.

H. S. Garrett, of Fort Worth, and C. B. Ames, of Oklahoma City, Okl. (Robert A. John and T. J. Lawhon, both of Houston, of counsel), for plaintiff in error.

Burkett, Orr & McCarty, of Eastland, for defendants in error.

NICKELS, J. The opinion of the Court of Civil Appeals (255 S. W. 466) includes a

general statement of the case which, in its general features, is adopted here. The questions brought to the Supreme Court are severally discussed below.

[1] 1. The lease was executed August 15, 1918. It includes the following stipulations:

"If no well be commenced on said land on or before the 15th day of August, 1919, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in the First Guaranty State Bank at Cisco, Tex., or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of $200.00, ―――― dollars, which shall operate as a rental and cover the privilege of deferring the commencement of a well for 12 months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like period of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment covers not only the privileges granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred."

In that stipulation, it is asserted, the agreement of the parties in respect to the particular subject-matter is expressly stated, and hence "there is no room for implication for anything not so stipulated."

It is to be regarded as settled law that the nature of the contract such as that before us injects into the situation an implied covenant of protection. Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464; Jeff Chaison Townsite Co. v. Guffey Petroleum Co. (Tex. Civ. App.) 107 S. W. 609, and cases cited by the Court of Civil Appeals. Such a contract is to be distinguished from one like that involved in Burt v. Deorsam (Tex. Civ. App.) 227 S. W. 354, wherein, it appears, the parties in express terms covered the subject of protection from drainage. The implied obligation which we say inheres in the relation of the parties here is additional to what is expressly provided for in the instrument and is as much a part of the contract as if expressly stated. The fact that the obligation rests in implication and not in words may have an important bearing on remedies and their enforcement, but not in respect to rights otherwise.

[2] 2. With the obligation mentioned conceded arguendo, it is presented (under third assignment) that judgment of the lessee "exercised in good faith" is determinative, first, of whether given conditions make the duty active, and, second, of what ought then be done in performance. "The operator," it is said, "may make a mistake (no man is infallible), but his good-faith judgment precludes the matter"—i. e., of further inquiry.

The non sequitur arises on the fact that the standard of conduct is what is reasona-

ble—i. e., the supposed conduct of the average man. The "man on the spot" may be an expert and use his best judgment, yet he may be negligent or otherwise fall short of what the circumstances require (The Germanic, 196 U. S. 589, 25 S. Ct. 317, 49 L. Ed. 610; Comanche Duke Oil Co. v. T. P. Coal & Oil Co. [Tex. Com. App.] 298 S. W. 554), and if, perchance, he be less than "expert," the chances of variance from what is required in the standard have multiplication.

[3] The contradiction of ideas inheres in the impossibility of an existent obligation (with essential mutuality) whose burdens (on the covenantor) may be rendered innocuous as to him and whose rights (in the covenantee) may be practically defeated at the will of the covenantor. It takes two to make a contract; and if a contract is to be set aside in its practical phases, or novated, by mental operation, concurrence of the two minds is required. Expressions of different import, it must be admitted, are to be found. in texts and opinions. Many of those used by courts, however, will be found to be obiter or in themselves to include mutual contradictions, and others will be found to have been used in relation to situations of such particularity and individuality as to preclude their just application in the general field; many of the texts reproduce those characteristics of the opinions with misstatements, in some instances, of what the courts to which references are there made actually said.

The importance of the question and proper respect to those urging the position here and elsewhere require some exemplar discussion.

In T. & P. Coal & Oil Co. v. Stuard (Tex. Civ. App.) 269 S. W. 482, it was said:

"The implied obligation on the part of a lessee * * *· is to exercise good faith and sound discretion to drill to a depth that is reasonably necessary to test the land. * * * We think the evidence fully supports the trial court's finding to the effect that the lessee in this case exercised good faith and discretion in its conclusion that it would not be profitable to it to drill deeper the two wells sunk on the Stuard lease, or to sink another well on it, and that such is all that a lessee is required to do."

In the contract there the number and depths of such wells as would be sunk were left to implication; the suit was brought to recover damages upon allegations that the "two wells" mentioned were not sunk to the depths required by circumstances and that the circumstances required drilling of still "another well." Yet there was reversal of the trial court's judgment and remand of the cause, instead of reversal of the trial court's judgment and rendition of judgment for the lessee, despite the fact (held) that lessee had done "all that a lessee is required to do." In general, it may be said. "sound discretion," used in reference to duty of (and

performance by) an individual, is that discretion which the ordinarily prudent man would have used in a like situation, and the remand of the case may be explained only upon the supposition that the court used the term in that sense in the first sentence quoted. True, this brings the first sentence into conflict with the last clause of the last sentence quoted, but the fact of remander gives to the later expression a character of error, if the first expression be correct, and of obiter in any event. Grubb v. McAfee, supra, is cited to the propositions announced in the excerpt. In that case the Supreme Court specifically declared an obligation in the lessee "to exercise reasonable diligence to continue drilling and mining operations on the land after oil * * * encountered in the first well" (as, e. g., in the "two wells sunk on the Stuard lease" mentioned by the Court of Civil Appeals), and this, we think, establishes error in any ruling by the Court of Civil Appeals to the effect that a lessee's "good faith and discretion" (unless the "discretion" be a "sound" one) control. And that the Court of Civil Appeals reversed the trial court because of determination that the verdict and judgment were "against the weight of the evidence" (see Houston & T. C. R. Co. v. Strycharski, 92 Tex. 1, 37 S. W. 415), and not because, as a matter of law, the lessee's judgment exercised in good faith is the standard of conduct, has plain implication in the fact that the Supreme Court dismissed a petition in error "for want of jurisdiction."

It is our view that neither the lessee nor the lessor, situated as the parties here, is the final judge, but each is "bound by the standard of what is reasonable." Grubb v. McAfee, supra; Jeff Chaison Townsite Co. v. Guffey Petroleum Co., supra; Brewster v. Lanyon Zinc Co. (C. C. A.) 140 F. 801; Kleppner v. Lemon, 176 Pa. 502, 35 A. 109; Daughetee v. Ohio Oil Co., 263 Ill. 518, 105 N. E. 308. If it be true, as asserted, that the proof establishes (as a matter of law) good faith in the lessee here, that is not enough to put an end to the controversy.

[4] 3. Mrs. Ramsover accepted "rentals" provided for in that part of the "lease" quoted in "1," above, for the period intervening execution of the "lease" (August 15, 1918) and August 15, 1922; that is payments were made July 25, 1919 (for year beginning August 15, 1919), July 26, 1920 (for year beginning August 15, 1920), and July 26, 1921 (for year beginning August 15, 1921). A well was not drilled on the leased premises. The first of the wells whose drilling and operation is alleged to have caused drainage of the leased premises was completed November 29, 1920. Plaintiff in error contends that acceptance of rentals precludes right to damages. The contention has a double aspect: (a) The payment of July 26, 1920, secured the right to delay drilling until August 15, 1921, and, thus, to save lessee from responsibility for drainage occurring between November 29, 1920, and August 15, 1921, because it was so stipulated in advance; (b) acceptance of the payment of July 26, 1921, was with knowledge of then existent conditions, including lessee's failure (if not refusal) to drill offsets, and amounted to waiver of damages, etc.

(a) In consequence of what is said in "1," above, the stipulation has reference to a prospecting or developing well to be drilled (or omitted) at the will of the lessee and does not relate to the subject-matter of the covenant implied by way of addition. The two agreements include different subjects; and while a fact condition might exist wherein election (under the expressed stipulation) to drill might satisfy the requirement of the implied covenant, it would be so only in recognition (by the lessee) of existence of both obligations and not in repudiation of either. We may suppose a fact illustration: A lease covers 640 acres in form of a square; lessee drills a well near the southeast corner of the tract; before or after drilling of that well, another operator completes a well on an adjoining tract but near the northwest corner of the 640 acres, and from which such large quantities of oil are produced as to make it plain that drainage of the 640 acres occurs. Undoubtedly, in the case put, the well in the southeast corner of the leased premises would be a substitute for the annual rental contingently stipulated; but it could not be taken in negation of the covenant for protection, and the lessee's failure to drill in the neighborhood of the other well, upon a claim that he had already complied with the expressed stipulation, would be in plain denial of existence of the implied covenant or in plain breach of it.

[5] (b) Perforce the expressed stipulation, with absence of drilling operations, rentals became due at the recurring intervals named, and their acceptance was in affirmation of and harmony with the entire contract. Continued insistence upon performance of the implied covenant, or continued maintenance of right to damages for its breach, was, also, in affirmation of the whole contract; this is true because acceptance of what became due in any event pursuant to one stipulation cannot be taken as admitted fulfillment of another stipulation or in excusal of nonperformance thereof.

[6-8] (c) It is probable that the nature of the covenant precluded a right to rescind the "lease" at due date of the 1921 "rental." Grubb v. McAfee, supra. If Mrs. Ramsower had that right in consequence of prior breach or repudiation of the covenant, its existence put her to an election (at that time) as between rescission and affirmance of the contract. Receipt of the money tendered

is evidence (if not conclusive evidence) of election to affirm. That act no doubt bound her, but only as to election between inconsistent rights and remedies. She could have waived the claim for damages, etc., in connection with affirmance; but waiver is largely a question of intent, and mere acts of affirmance (such as those here) amount to a waiver only when done "with the intention clearly manifested of biding by the contract and waiving all right" to damages—the acts themselves not being evidence of intention to waive. Kennedy v. Bender, 104 Tex. 149, 152, 135 S. W. 524; Schmidt v. Mesmer, 116 Cal. 271, 48 P. 54.

(d) It results, in our opinion, that the remedy sought and given was appropriate to the cause of action averred and consistent with the theory on which Mrs. Ramsower acted in acceptance of the rentals. See, generally, Grubb v. McAfee, supra; Greenwall Theatrical Co. v. Markowitz, 97 Tex. 479, 79 S. W. 1069, 65 L. R. A. 302; Witherspoon Oil Co. v. Randolph (Tex. Com. App.) 298 S. W. 520, and authorities there cited.

(e) Anomalous resultants of a different view may be noticed by way of testing the justice of that already expressed: By payment of annually accruing rentals the lessee would keep the contract alive for five years, and thus secure the exclusive right to prospect for minerals or develop them; the landowner, because of that exclusion, could not develop even though it were patent that oil were being drained from his land through neighboring wells; his helplessness notwithstanding, his undoubted injury would be damnum absque, because the "down payment" and the yearly rental would make up the true consideration of the "lease" (contrary to what is said about the nature of the contract, consideration, etc., in Texas Co. v. Davis, 113 Tex. 321, 254 S. W. 304, 255 S. W. 601, Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566, and in similar cases).

[9] (4) The seventh assignment is this:

"The trial court erred in overruling defendant's objections to the charge because it failed to instruct the jury on the measure of damages and in refusing defendant's request that the court so instruct the jury, and the Court of Civil Appeals erred in not sustaining the proposition."

The "request" mentioned in the assignment did not include preparation and presentation (for submission) of a charge on the subject. And the "request," it will be noted, was not a request for submission of a "special issue," but was for a charge on the law of the case. In that state of the record, the fact (shown in the assignment) that the court "failed to instruct the jury on the measure of damages" precludes review here. Gulf, C. & S. F. R. Co. v. Conley, 113 Tex. 472, 475, 260 S. W. 561, 32 A. L. R. 1183.

[10] 5. Under various assignments it is insisted that there is lack of evidence to show drainage of the leased premises and the amount thereof. The question here, of course, is not weight or preponderance of evidence, but it is whether drainage and the amount found by the jury were issuable. We merely supplement the statement of evidence as made by the Court of Civil Appeals.

[11] There is evidence tending to show: (a) The east line of the Higginbotham "section" (640 acres) is coincident with the west line (and prolongation) of the 200 acres covered by the lease in question, and that the "northeast corner" of the first tract is coincident with the "northwest corner" of the latter. (b) About November 29, 1920, parties other than Texas Company completed a well on the Higginbotham "section" near the northeast corner—possibly 150 feet west of the common boundary, possibly 300 feet west of that boundary. (c) With aid of a "shot" that well "came in making about two and a half million feet of gas and about thirteen hundred barrels of oil per day"; during December, 1920, it made about 1,000 barrels of oil per day; it continued to "flow" until July, 1921, with production gradually decreased to about 100 barrels per day (by July, 1921); it was put "on a pump" after "flowing" ceased; at time of the trial (March, 1922) it was "still producing." (d) While that well was being drilled, Obrey Ramsower, one of the plaintiffs (son of Mrs. Ramsower) interviewed Reese, a representative of Texas Company, "with reference to drilling some wells" on the 200 acres, saying "we would expect offset wells to these wells we thought were in offset distance," and the company's representative replying that the matter of drilling offsets would be "taken care of" if oil were found in the wells then being drilled. (e) "Soon" after that well "came in" (November 29, 1920) Reynolds (a son-in-law of Mrs. Ramsower) interviewed Reese; Reynolds said, "I think we are due an offset," and Reese replied, "Well, if it" (meaning the Higginbotham well) "is the well I hear it is, * * * you are" (entitled to an offset). (f) Some time between November 29, 1920, and March 3, 1921, another well (the "Ray wells"), "about the same distance" from a boundary of the 200 acres as was the Higginbotham well already mentioned, "came in" as a producer of oil, "flowing" oil. (g) In February, 1921, a well (the "Reagan"), "east" of the 200 acres, "came in" "flowing" oil. (h) In February or March, 1921, two other wells were completed on the Higginbotham "section," and flowed oil. (i) "About a month" after the first well mentioned "came in" (November 29, 1920), Obrey Ramsower again interviewed Reese about offsetting it; Reese said that he had notified the "Houston office" (of the company) about the Higginbotham well and the proposition of offsetting, but that he had not received orders to offset; thereafter (according

to Obrey Ramsower) "they kept going to Reese about offsetting, and he finally got mad and told them he did not aim to drill the 200 acres." (j) Soon after the "Ray well" came in (and about March 3, 1921), Reynolds went again to Reese and told him "it seems like we are entitled to an offset to one of those wells or our lease back"; Reese said he was "working on it just as hard as he could, but that he hadn't heard anything from the Houston office," that "he would take it up with Houston again," and that Reynolds should "come back in two or three days." (k) The market price of oil produced in the territory was $3.50 per barrel from March ———, 1920, to January 24, 1921; January 24, 1921, to January 30, 1921, $3 per barrel; January 30, 1921, to February 29, 1921, $2.50 per barrel; February 29, 1921, to May 2, 1921, $1.75 per barrel. (1) Oil will drain in that territory indefinite distances, depending upon length of time involved, character of underground structure, etc., "at least a quarter of a mile."

Calculations may be based upon data thus given, and to show that during the months of December, 1920, January, February, March, and April, 1921, more than 90,000 barrels of oil were taken from the well drilled in the northeast corner of the Higginbotham tract—within from 150 feet to 330 feet of the common boundary—having a market value of more than $250,000. That substantial quantities, of substantial value, were subsequently produced from that well is shown by testimony to the effect that its natural production in July, 1921, was about 100 barrels per day and that it was still producing in March, 1922.

The statements of Reese, supposedly in the line of duty and reflecting the ideas of an expert, might properly be regarded by a juror as showing conscious belief, resting in expert knowledge, that drainage was then taking place.

In view of these (and other) facts and circumstances given in testimony, it cannot be held as a matter of law that there is no evidence of drainage or of the amount thereof within range of the verdict. The subject is justiciable, and this, with its nature otherwise, remits to the triers of fact-issues, ex vi necessitate, a problem of much estimation. Comanche Duke Oil Co. v. T. P. Coal & Oil Co. (Tex. Com. App.) 298 S. W. 554, 566; Texas Emp. Ins. Ass'n v. Shilling (Tex. Com. App.) 289 S. W. 996.

[12] 6. After the introduction of evidence had been closed and the charge had been prepared, and while the judge was in the act of reading the charge to the jury, counsel for defendants in error asked permission of the court to offer "testimony * * * on the question of the market value of oil." Leave was given and testimony about value set out above in "5" (and confined to value) was admitted. Counsel for plaintiff in error seasonably objected to granting of the request on the ground that his witnesses (previously excused) had gone to distant parts and that he would have "no opportunity of rebutting the testimony" to be offered. In granting leave, the trial judge stated to counsel for plaintiff in error he would hear the testimony and give counsel time to get the witnesses needed if there should be testimony which he desired to rebut. When the testimony about values had been finished, counsel for plaintiff in error stated to the court:

"Certainly I have no testimony to offer now. As I stated to the court a moment ago, I do not know the whereabouts of my witnesses now," etc.

Motion for new trial was filed by plaintiff in error, and one ground set up is that the court erred in the proceedings just mentioned—with allegations that counsel would have introduced witnesses (had they been available) "who would have testified to the exact market value" of the oil and "the exact amount of oil produced" from the Higginbotham well. When the motion was heard counsel for plaintiff in error testified, inter alia, that he would have proven values per barrel as follows: January, 1920, $3.50; January, 1921, $3 for part of the month and $2.50 for the balance of the month; February, 1921, "$2.50 and $2 and $1.75"; March, 1921, $2; April, 1921, "$2 and $1.75"; May, 1921, "$2 and $1.75"; June, 1921, $1; July and August, 1921, $1. Such testimony, it is noted, would have omitted any reference to prices in December, 1920; shown a slightly lower range than that shown by plaintiff's witnesses for January and February, 1921; shown a range of prices for March, April, and May, 1921, higher than that shown by plaintiff's witnesses; and would have added values theretofore lacking for May, June, July, and August, 1921.

The action of the trial judge is the subject of the remaining assignment.

[13] Broad discretion touching reopening of a case "at any time before conclusion of the argument" is vested in the judge by the terms of article 2181, R. S. 1925 (article 1952, R. S. 1911).

There is lack of showing that witnesses other than those previously excused could not have been secured pursuant to the court's offer to give time. The case was tried in the heart of an oil field, where the subject-matter of market values must have been generally known and where witnesses, for aught shown, were easily procurable.

[14] The testimony of counsel (given on the motion for new trial) shows that, if his original witnesses had testified, they would have contributed a substantial amount of evidence in respect to values against his client, would not have contradicted plaintiff's testimony about values in December, 1920 (an important month), and for other periods the conflict of testimony thus produced would have been but slight.

[15] Besides, the witnesses were excused with imputed knowledge of the terms of article 2181 and of the possibility, if not probability, that the case would be reopened prior to "conclusion of the argument."

In that posture of the matter of new testimony about values, it cannot here be said that the trial judge abused the discretion vested in him by law.

[16] In the new testimony of plaintiff there is no reference to the amount of oil produced from the Higginbotham well. The testimony of counsel (given on the motion for new trial) shows that his witnesses could have disclosed the amount of that production; that was a relevant matter and one inviting disclosure throughout introduction of defendant's testimony. The opportunity then given for its admission was not used, and the mere fact that it might have been offered (as new testimony) on reopening the case for another purpose is beside any point now reviewable.

We recommend that the judgment of the Court of Civil Appeals be affirmed.

CURETON, C. J. Judgment of the Court of Civil Appeals affirmed.