## LINDOW v. SOUTHERN CARBON CO.
### No. 2065.

District Court, W. D. Louisiana, Monroe Division.

Jan. 14, 1932.

G. P. Bullis, of Vidalia, La., for complainant.

Oliver & Digby, of Monroe, La., for respondent.

DAWKINS, District Judge.

The original petition in this suit was filed on September 1, 1931. Petitioner alleged that on November 5, 1926, he executed an oil and gas lease to one J. C. Roberts, covering the N. W. ¼ of the N. E. ¼ and the E. ½ of N. W. ¼ of Sec. 16 N., Range 6 E., containing 120 acres, copy of which is annexed to the petition, "and reference is thereto made for its full contents"; that since January 1, 1928, said land has been surrounded "in every direction by tracts on which are wells producing large amounts of gas," and that within less than one mile of said property is located "a large gas well known as 'Thomason crater'," which "flowed uncontrolled into the open air since February 1, 1928 to April 11, 1931"; that Roberts assigned said lease to the Southern Carbon Company on November 20, 1926, and that on September 1, 1927, petitioner "signed an oil and gas lease to said Southern Carbon Company covering the N. W. ¼ of the N. E. ¼ of said Sec. 16" (which is the same description as the first described 40 acres in the lease to Roberts).

Petitioner further alleged as follows:

"9. It is an implied condition of these leases in a proven gas field, and the principal consideration to petitioner, that lessee shall drill as many wells on said leased land as may be reasonably necessary to develop the land properly, and to secure the gas under it for the common benefit of lessor and lessee."

"12. Gas has been drained from under petitioner's said land, by the aforesaid wells on adjacent lands, continuously since January 1st, 1928, and said Thomason crater especially has drained an immense amount of gas from said land."

"13. Because of said drainage, the pressure of gas under petitioner's said land, and the quantity of gas which can be hereafter procured thru wells drilled on said land, is less than one-third the amount thereof on January 1st, 1928."

"14. Southern Carbon Company, being well experienced and expert in the gas business and actively engaged therein in the Richland gas field during all of this period, were well aware of the tremendous loss being sustained by petitioner because of said drainage, and of their obligations under said lease, but petitioner, being ignorant of the gas business, was not fully aware of it until recently."

"15. Said leases having conferred on the Southern Carbon Company the exclusive right to drill for and procure gas from said land, and petitioner having been thereby deprived of all rights and control over his own property, Southern Carbon Company was thereby obligated to protect petitioner, by drilling sufficient wells, and procuring therefrom sufficient gas, not only to offset the wells draining it thru other land, but also to place petitioner on a basis of equality of production and royalties with other land owners similarly situated."

"16. Said obligations recited in paragraphs 9 and 15 hereinabove, required that said lessee drill for and procure from petitioner's said land, sufficient gas to pay as

royalties under said leases to lessor, not less than $20 per acre per month on an average from January 1st, 1928 to the present time."

"17. Petitioner has made repeated written and oral demands on Southern Carbon Company to comply with its said obligations under said lease, by drilling wells and giving reasonable development."

"18. Southern Carbon Company have failed, neglected and refused to take any action whatever in the matter."

"19. Despite the facts aforesaid, that petitioner's land has been for nearly four years in the central part of one of the large and rich gas fields of the United States, and under lease for nearly five years to a large producer of natural gas, yet no well has been drilled on said land, and petitioner has received none of the wealth as royalties to which his fortunate position entitled him."

"21. Southern Carbon Company is therefore indebted unto petitioner, for payments due under said lease, and in satisfaction and discharge of its obligations under said lease, the sum of $20 per acre on 40 acres, and $15 per acre on 80 acres, making a total of $2000 per month, for each month since January 1st, 1928."

The prayer was for judgment at the rate of $2,000 per month from January 1, 1928, until trial, with interest at 5 per cent. per annum.

Defendant filed a prayer for oyer of the alleged assignment of the lease by Roberts to the Southern Carbon Company and an exception of vagueness both of which were sustained. The assignment was produced and filed. The plea of vagueness was based upon the proposition that the petition did not disclose in what manner or upon what basis the $2,000 per month was claimed, and in an amended petition, it was alleged that there had been drawn from the land 1,350,000 feet of gas per acre per month since January 1, 1928, and that during said time the price of gas had not been less than 12 cents per thousand cubic feet.

Thereupon, an exception of no cause of action was interposed and the matter has been submitted upon this exception.

Identical issues are involved in the cases of C. S. Thomason v. Southern Carbon Co. No. 2067, and Mrs. Jennie Price v. Richland Production Company, No. 2068 (No. 458—In Equity), which have also been submitted upon the same briefs. The last-mentioned case was filed as a bill in equity, but upon motion of the defendant, was transferred to the law side of the court, and the ruling made in the present case will dispose of the same exception of no cause of action in all three.

The bases of the exception, as stated by defendant's counsel, are as follows:

"1. There is no contractual relation between plaintiff and defendants, the latter not having been parties to the original leases, and if any action for damages exists, it can be maintained only against the original lessees."

"2. The leases having been granted for five years, which will not expire for some months yet, and plaintiffs having accepted money from defendants, as fixed in the contract, for the privilege of deferring development, cannot during the period for which such money has been paid, maintain an action for damages caused by failure to drill, being, by their acceptance of delay rentals, estopped to complain."

"3. In Louisiana, there is no private ownership of the gas beneath the surface, it being publicly owned until reduced to possession; consequently no action can be maintained in respect of such gas so long as it remains in the common reservoir."

The copy of contract attached to the petition recites that "for a cash payment of $1,200.00 and other good and valuable considerations," the petitioner "has granted, demised, leased and let, etc. unto the lessee, for the sole and only purpose of mining and operating for oil and gas * * *" the property described. It further provides "that this lease shall remain in force for a term of five years from this date, and as long thereafter as oil or gas, or either of them, is produced from said lands by said lessee." The lessee agrees "to pay to the lessor one-eighth net 2¢ per 1,000 from each well where gas only is found, while same is being used off the premises. * * *" It further provides as follows:

"If no well be commenced on said land on or before the 5th day of November, 1927, this lease shall terminate as to both parties, unless the Lessee on or before that date shall pay or tender to the Lessor, or to the Lessor's credit in the Richland State Bank, at Rayville, La., or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of eighty and no/100 Dollars, which shall operate as a rental and cover the privilege of deferring the commencement of a well for 12 months from said date. In like manner, and

upon like payments or tenders, the commencement of a well may be further deferred for like periods of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privileges granted to the date when said first rental is payable as aforesaid, but also the Lessee's option of extending that period as aforesaid, and any and all other rights conferred."

### Opinion.

I am not impressed with the first ground of the exception. If there was an implied obligation to drill the property to prevent drainage, my opinion is that the same ran with the lease, and having acquired it by assignment, the defendant necessarily took the obligations along with the privileges and benefits. It became one of the considerations for the rights conferred.

The second ground is more serious. It was evidently intended from the very language of the lease that by the payment of the sum of $80 annually, "the commencement of a well may be (might be) further deferred for like periods of the same number (12) of months successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privileges granted to the date when said first rental is payable as aforesaid, but also the Lessee's option of extending that period as aforesaid, and any and all other rights conferred."

The important question under this heading is: Was the lessee or his assignee, notwithstanding the provision for deferring operations, required to protect the property from drainage after it became proven territory, regardless of the above-quoted provision? If so, can the plaintiff maintain this action for damages? The exact issue has never been decided by the Supreme Court of this state. It is true that in the cases cited by counsel for plaintiff, it has been held, where the lessee once begins operations and the lease is thereby ripened into a commutative contract, carrying with it the stoppage of rentals and the perpetuating of its rights and privileges so long as the discovered minerals are produced in paying quantities, he is bound to reasonably develop for the benefit of the lessor, and to protect the property against drainage. This is so, I think, because the leases there involved as well as the present one, fairly contemplate that course and the courts have read into such contracts these implied obligations, though not specifically set forth. The reason is that the main purpose of a mineral lease, as distinguished from one in form, but in fact an option, for which the alleged lessee pays a consideration satisfactory to the lessor, is to produce these minerals in as large quantities and as expeditiously as possible, to the end that the latter may receive the proceeds from his portion thereof. However, for the injury which he suffers by lack of development, after his land is proven to be in a highly productive field, the courts of some of the other states have held justice entitles the lessor to sue for damages for the failure to develop the property promptly and protect it from drainage. In two of them, Texas (Texas Company v. Ramsower [Tex. Com. App.] 7 S.W.(2d) 872), and Arkansas (Blair et al. v. Clear Creek Oil & Gas Company, 148 Ark. 301, 230 S. W. 286, 19 A. L. R. 430), it has been held that the lessor, notwithstanding the acceptance of the stipulated rentals, may sue for damages caused by drainage through the failure of the lessee to develop or to offset wells of others on adjacent lands, which clearly drain the minerals from the lands of the lessor, or may annul the lease. On the other hand, the Supreme Court of West Virginia has worked out a solution of the problem which I believe comes nearer doing justice between the parties. Carper v. United Fuel Gas Company, 78 W. Va. 433, 89 S. E. 12, L. R. A. 1917A, 177; Stanley v. United Fuel Gas Company, 78 W. Va. 793, 90 S. E. 344; and Chambers v. Perrine, 81 W. Va. 321, 94 S. E. 381. It is there held that the parties having made a mutually satisfactory agreement, which expressly gave to the lessee the right to drill or not for a fixed period of time (usually five years) in consideration for the payment of an annual sum, it would not be proper in equity or good morals to mulct the lessee in damages after it had been proven that the land was productive when the lessor had continued to receive the stipulated consideration over a long period of time without protest, and after the drainage had taken place; and that to compel the lessee to pay a royalty upon the minerals so withdrawn by others, no part of which he had received, would be obviously unfair. The West Virginia court has decided, therefore, that before the lessor can claim either the right to damages or to annul such a contract, he must first demand drilling before the expiration of the current term for which payment has been received, and refuse thereafter to accept rentals for any further delays. By that means he

puts the lessee on notice that he must develop and that he will not continue to consent to delays because of the injury which he is suffering through drainage. Otherwise, the lessee might keep silent to the end of the optional period, receive the rentals paid for the privilege of deferring operations without protest, and then demand, in addition, the full measure of profit or benefit which could have been received had he put the lessor on notice in the manner indicated and required him to develop. The obvious injustice of such a course appeals strongly to the judicial mind. See, also, Saunders v. Busch-Everett Company, 138 La. 1049, 71 So. 153; Kachelmacher v. Laird, 92 Ohio St. 324, 110 N. E. 933, Ann. Cas. 1917E, 1117; Chapman v. Kendall, 145 Okl. 107, 291 P. 97; Southwestern Oil Co. v. McDaniel, 71 Okl. 142, 175 P. 920; Eastern Oil Company v. Beatty, 71 Okl. 275, 177 P. 104; Monarch Oil, Gas & Coal Company v. Richardson, 124 Ky. 602, 99 S. W. 668; Satterfield v. Galloway, 192 Ky. 780, 234 S. W. 448; Ocalo Oil Co. v. Hughes, 187 Ky. 486, 219 S. W. 799; Swiss Oil Corp. v. Howell, 199 Ky. 763, 251 S. W. 1007; Orr v. Comar Oil Co. (C. C. A.) 46 F.(2d) 59.

In the present case the plaintiff does not expressly allege that he has continued to accept the rentals, but the allegation that the lease is still in force, I think necessarily implies as much. In any event, counsel, in argument, has conceded this to be true. It is also apparent that he has known that the property was in proven territory from the alleged date of January 1, 1928, and that drainage was taking place while he was accepting these payments. He does allege that he demanded drilling.

My conclusion is that, if the courts must read into such contracts the implied obligation to protect the property from drainage, they must likewise apply the principles of justice as laid down by the West Virginia Supreme Court and require of the plaintiff that he shall put the lessee on notice that he must drill before the expiration of any given period for which payment has been made, and

thereafter refuse to receive it. He may then insist either upon development or that the lease be surrendered.

I think I may take cognizance of the large area of the gas fields in this locality which has been covered by many leases, the acreage of some holders being very extensive, and others small. If the operator should have to develop each lease or be compelled to pay the owners of the property which has not been drilled, in addition to the royalties which they have paid to others for the gas drawn through the wells upon their lands in the vicinity, over the period of years these fields have been in operation, the result would indeed be serious to all of those who have had the hardihood to spend money for development. Naturally, they have taken leases upon a large amount of acreage to insure a supply over a long period of time, and if every lessor of a few acres, no matter how small, could maintain an action in damages like this, after pursuing the course above outlined, it would indeed be hazardous for any one to attempt operations upon a large scale. It might also result in the large operators, once they had gotten the field fairly well checkerboarded, refusing to lease the lands of smaller owners altogether and leave them without recourse. Comparatively few individuals have the means to develop and usually the large operators are compelled to make enormous expenditures in drilling wells, providing pipe lines, etc, for marketing, and the small owner would be completely at their mercy under such circumstances. In time, the state may be compelled, through its legislative department, to make provision for the protection of all who, by virtue of ownership of the surface, have a common interest in a proven oil or gas pool or sand. However, the courts cannot legislate and it is their duty to decide these questions as nearly in accord with justice and equity as possible.

I am constrained, therefore, to hold that for the reasons above set forth, the petition does not disclose a cause of action. Proper decree should be presented.