O’NEILL, Chief Justice.
 

 This is a suit to annul an oil and gas lease on the ground that the lessee failed to comply with a stipulation to drill offset wells to prevent the draining of gas from the leased premises. The judge of the district court after hearing the case on its merits gave judgment for the plaintiff annulling the lease. The defendants,
 
 *645
 
 Southern Production ' Company, original lessee, and the Amerada Petroleum Corporation, assignee of part of the lease, are appealing from the decision.
 

 The lease was granted by J. M. Hood to the Southern Production Company on January 10, 1941, for a cash consideration or bonus of $4,000, for the primary term of five years. The leased premises consisted of 100 acres, 35 acres being in Section 2 and 65 acres in Section 3, in T. 11 N., R. 16 W., in DeSoto Parish. The lease contained the usual stipulation that if operations for the drilling of a well should not be commenced on the land within one year from the date of the lease, the lease should terminate as to both parties unless on or before the anniversary date the lessee should pay or tender to the lessor or deposit to his credit in the Logansport Bank $250, called the rental, which should cover the privilege of deferring commencement of drilling operations for a period of 12 months; and that in like manner and upon the payment or tender of the $250 rental annually the commencement of drilling operations might be deferred for successive terms of one year during the five years primary term of the lease.
 

 The lease contained also this stipulation:
 

 “In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and draining the leased premises the lessee agrees to drill such offset wells as a reasonably prudent operator would drill under similar circumstances.”
 

 On March 1, 1941, the Southern Production Company assigned the lease to the Amerada Petroleum Corporation,' and on the next day the Amerada Petroleum Corporation reassigned the lease to the Southern Production Company so far as it covered the gas and liquid hydrocarbon rights, except oil.
 

 On December 22, 1941, the Southern Production Company and the Amerada Petroleum Corporation deposited to the credit of the lessor in the Bank of Logansport the $250 rental to defer drilling operations for the period of one year from January •10, 1942, to January 10, 1943. 'The lessor accepted the payment sometime before January 10, 1942.
 

 On June 27, 1941, the Department of Conservation, acting under authority of Act No. 157 of 1940, issued its Order No. 28, defining and establishing drilling units, of 320 acres each, in the Jeter Horizon, in the Logansport Field, in which field the leased land is located. According to the statute and the order itself, the drilling units were established to prevent waste, to avoid the drilling of unnecessary wells and to protect the correlative rights of the owners of mineral interests in the gas field to share ratably in the production of gas from the common reservoir. The order divided the entire gas field into drilling units of 320 acres each, and forbade the drilling of more than one well on any one drilling unit. On October 16, 1941, the Department of Conservation issued another order, called Order 28-B, again establishing drilling units of 320 acres each and providing again that not more than one well on any one drilling unit should be allowed to produce gas from the Jeter Horizon.
 

 
 *647
 
 Sometime in the latter part of 1941 a producing well, called the Bland Well, in Section 11, was completed and connected with the pipe line, and produced large quantities of gas. The well is about half a mile from the 100 acres leased by Hood to the Southern Production Company. Section 11 is a regular section in place and is therefore immediately south of and adjacent to Section 2, which also is a regular section in place.
 

 On December 23, 1941, the Federal official called Director of Priorities, Office Production Management, issued Conservation Order M-68, forbidding any operator engaged in the production of natural gas to order or purchase or accept the delivery of, or to withdraw from inventory, or in any other manner to acquire or use, any material or commodity or equipment for the production of natural gas, except where the material or commodity or equipment was to be used by the operator to drill or to complete or to provide additions to any well conforming to a uniform well-spacing pattern of not more than one well on each 640 surface acres.
 

 On February 10, 1942, the Commissioner of Conservation issued Order No. 28-C, also under authority of Act No. 157 of 1940, increasing the size of the drilling units from 320 acres to 640 acres, and forbidding the drilling of more than one well on any one drilling unit of 640 acres to the Jeter Horizon.
 

 On May 15, 1942, the Southern Production Company bought a large gas well, called the Lewis Well, located on Section 2 and about three-quarters of a mile from the 100 acres leased by Hood to the Southern Production Company. The Lewis Well was connected with the pipe line soon after May 15, 1942, and, like the Bland Well, has been producing gas in considerable quantities ever since that date.
 

 The Federal Order M-68 was amended on November 12, 1942, so as to limit the right to purchase or otherwise acquire materials or equipment for the drilling of a well conforming to a uniform well-spacing pattern of 40 acres for oil fields, or a well conforming to the uniform well-spacing pattern of 640 acres for gas fields. As amended the order provided expressly that no well spudded after December 23, 1941, should be considered as drilled in conformity with a uniform well-spacing pattern unless “all separate property interests of less than 40 surface acres in the case of an oil field, 640 acres in the case of a gas field, or in tracts on which a well cannot otherwise be drilled by virtue of the provisions of this order surrounding the designated drilling location of any well, are first consolidated with each other, another, or other property interests to form a drilling unit (consisting of not less than 40 surface acres in the case of an oil field or 640 surface acres in the case of a gas field) on which a well may be drilled,” et cetera.
 

 On December 29, 1941, Hood, through his attorney, addressed a letter to the Southern Production Company complaining that the well in Section 2, referring to the Lewis Well, was draining gas from the 100 acres leased by Hood to the Southern
 
 *649
 
 Production Company, and in his letter Hood requested the Southern Production Company either to drill an offset well on the 100 acres or to surrender the lease. Again on March 6, 1942, Hood’s attorney wrote to the Southern Production Company complaining that the well in Section 2 and another well “to the northeast”, not identified, were draining the 100 acres leased to the Southern Production Company; and in this letter the attorney for Hood declared that unless some adjustment would be made suit would be brought to cancel the lease. Four days after the writing of that letter the attorney for Hood wrote another letter to the Southern Production Company advising that he was in error in stating that the gas well in Section 2 had been producing gas since January 1942, and stating that he was afterwards informed that the well was closed and had been used only for the purpose of drilling another well. He complained however that gas was being produced and sold for commercial use from the Bland well in the NEj4 of NW1^ of Section 11, and that that well was draining gas 'from the 100 acres leased by Hood to the Southern Production Company. The letter concluded with a request to be informed of the company’s attitude with respect to the drilling of an offset well on the leased premises. On March 11, 1942, the Southern .Production Company wrote a letter to the' attorney for Hood, acknowledging receipt of his letters of March 6th and 10th, and suggesting that Hood should agree to pool at least a part of his 100 acres with the remaining land in Section 2 so as to form a drilling unit or production unit of 640 acres, in compliance with Order 28-C issued by the Commissioner of Conservation on February 10, 1942. The Southern Production Company, in its letter to the attorney for Hood, advised him that the Commissioner of Conservation had advised the Southern Production Company that the well in Section 2, probably referring to the Lewis Well, could not be put on production until there would be allocated to that well the entire 640 acres composing the section in which the well was located. It was stated in the letter that the Order 28-C forbade the drilling of more than one well in any one section of 640 acres, designated in the order as the drilling unit or production unit. In its letter the Southern Production Company declared also that under Order M-68, issued by the Office of Production Management of the Federal Government, no gas well could be drilled on any lease or unit having an area less than 640 acres. It was stated in the letter that the only method by which Hood could participate in the production of gas from his 100 acres of land was to pool the land with other lands sufficient to make up a 640-acre drilling or production unit.
 

 Hood brought this suit on May 4, 1942, to cancel the lease of his 100 acres of land on the ground that the Southern Production Company had violated the stipulation to drill an offset well to protect the land from drainage. The petition was after-wards supplemented with the averment that the Southern Production Company had bought the Lewis Well in Section 2, and that that well and the Bland Well, also-belonging to the Southern Producton Com
 
 *651
 
 pany, in Section 11, were draining the 100 acres leased by Hood to the Southern Production Company.
 

 The defendants pleaded that the plaintiff's petition did not set forth a cause of action, the basis of the exception being that the plaintiff had accepted the $250 rental for the period from January 10, 1942, to January 10, 1943, and had thereby consented to defer the commencement of drilling operations until January 10, 1943. The judge of the district court overruled the exception of no cause of action; and our opinion .is that the ruling was correct. The Bland well was not connected with the pipe line and therefore was not draining the leased premises until about nine days after the delay rental was paid. And the Lewis well was not connected with the pipe line until sometime after May 15, 1942, more than four months after the delay rental was paid. Besides, the law on the subject makes a distinction between the cases in which the obligation to drill offset wells is only an implied obligation and the cases in which it is an expressed obligation. The majority of the courts hold that the acceptance by the lessor of delay rental with knowledge of a breach of an implied covenant to drill on offset well operates as a waiver of any right of action either for damages or for a forfeiture of the lease for failure to drill an offset well during the period for which the rental was received. But, where the covenant to drill offset wells is an expressed covenant, an acceptance of delay rentals will not constitute a waiver of the right of the lessor to demand the drilling of an offset well during the period for which the delay rental was received if the conditions have become such as to require the drilling of an offset well under the terms of the contract. Summers on Oil and Gas, Perm.Ed., vol. 2, § 399, page 343 et seq. The following cases, cited by the defendant, support the proposition only that an acceptance of delay rental by the lessor is a waiver of his right to enforce an implied obligation on the part of the lessee — but have no application to an express obligation — to drill offset wells to protect the leased premises from drainage: McCoy v. State Line Oil & Gas Co., 175 La. 231, 232, 143 So. 58; Carper v. United Fuel Gas Co., 78 W.Va. 433, 89 S.E. 12, L.R.A.1917A, 171, 177; Stanley v. United Fuel Gas Co., 78 W.Va. 793, 90 S.E. 344; Eastern Oil Co. v. Beatty, 71 Okl. 275, 177 P. 104; Orr v. Comar Oil Co., 10 Cir., 46 F.2d 59; Lindow v. Southern Carbon Co., D.C., 5 F.Supp. 818. The conclusion which we have reached on the merits of this case, however, makes the exception of no cause of action a matter of little or no importance.
 

 On the merits of the case of defendant, Southern Production Company, contends that there was no violation of the covenant to drill offset wells on the leased premises, because the Conservation Orders, No. 28-C and 28-C-2, and the Federal Order M-68 issued by the Director of Priorities, Office Production Management, prevented the drilling of more than one well on the drilling unit of 640 acres in Section 2, in which 35 acres of the 100 acres leased to the Southern Production Company are located, and because these orders prevent al
 
 *653
 
 so the drilling on the 65 acres of the plaintiff’s 100 acres in Section 3. The record discloses that the judgment appealed from, cancelling the lease because of the failure to drill an offset well, was rendered on March 17, 1943; after which date the Commissioner of Conservation issued the order called Order No. 28-C-13, consolidating and pooling the separately owned lands into a unit described as fractional Section 3, containing 606 acres, and fractional Section 4, containing 52.34 acres, in T. 11 N., R. 16 W., of which drilling unit the plaintiff’s 65 acres in Section 3 forms a part. The order, No. 28-C-13, having been issued after the judgment was rendered in this case, wa's by consent of the parties made a part of this record, under an agreement that that order should be considered as a part of the record in this case.
 

 At the time when the lease in contest was made, January. 10, 1941, the Conservation Department had not established drilling or production units in the Logansport Field. At that time, however, Act No. 157 of 1940, authorizing the Commissioner of Conservation, for the prevention of waste and to avoid the drilling of unnecessary wells, to establish drilling units, was in effect. It appears that the parties to the lease now in contest contemplated that the Commissioner of Conservation might establish drilling units in the Logansport Field, and might forbid the drilling of a well on an area less than the established unit. The printed form of the lease contained a clause providing that if at any time during the period of the lease the lessee should deem it advisable or expedient to form a drilling unit or units to conform with spacing rules issued by the Conservation Commissioner or by any federal authority having control of such matters, or in order to conform with conditions imposed upon the issuance of drilling permits, the lessee should have the right to pool or combine the land covered by this lease, or any portion thereof, with any other land or lease or leases in the immediate vicinity, et cetera. Hood insisted upon deleting this ■•.printed clause in the form of lease- — and it was deleted — because Hood refused to grant permission to the lessee to combine or pool the leased premises with other land or mineral interests for . the purpose of forming a drilling or production unit. The deleting of this provision in the printed form of lease merely denied the lessee the right to consent to pooling the leased premises with other lands or mineral interests, but it did not, because it could not, interfere with the authority of the Commissioner of Conservation or with any federal authority, to compel the combining or utilizing of the leased premises with other land or lands or mineral interests for the purpose of forming a drilling unit, for the prevention of waste and to avoid the drilling of unnecessary wells. In this connection we refer to Section 9 (a) of Act No. 157 of 1940, p. 620, where it is provided :
 

 “When two or more separately owned tracts of land are embraced within a drilling unit which has been established by the Commissioner as provided for in Section 8 (b), the owners thereof may validly
 
 *655
 
 agree to pool their interests and to develop their lands as a drilling unit. Where, however, such owners have not agreed to pool their interests, the Commissioner shall, if found by him to be necessary for the prevention of waste or to avoid the drilling of unnecessary wells, require such owners to do so and to develop their lands as a drilling unit.”
 

 The orders of the Commissioner of -Conservation establishing the drilling units, and requiring the pooling of separately owned tracts of land in the Logansport Field, were made after due notice and hearing, and were attended by both of the parties to the lease now in contest. And it is conceded that these orders are valid and afford to the owners of the mineral interests in each tract of land in the established drilling units an opportunity to receive his just and equitable share of the gas in the Jeter Horizon.
 

 Our opinion is that the clause in the lease now in contest, requiring that, in the event a well producing oil or gas in paying quantities should be brought in on adjacent land and should be draining the leased premises, the lessee should drill such offset wells as' a reasonably prudent operator would drill under the same or similar circumstances, is not applicable to this case, especially where the well that is said to be draining the leased premises is on land within the 640-acre drilling unit of .which the leased land forms a part, and where the lessee is forbidden by the orders of the Department of
 
 Conservation and
 
 by the Federal Order M-68, issued by the Director of Priorities, Office Production Management, to drill a well on the leased premises.
 

 The plaintiff relies upon the doctrine that where the performance of an obligation of a contract is rendered impossible by the adoption of a prohibitory law both parties to the contract are discharged. 12 Am.Jur., Contracts, Sec. 379, p. 954; 137 A.L.R. 1210. That means that if one of the parties to a contract is forbidden by a law enacted subsequent to the making of the contract to perform his obligation, he and the other party are both released from their obligations and thus the contract is dissolved and the parties are restored to the situation in which they would be if the contract had not been entered into. But that doctrine is not applicable to this case because the defendant in reality has not failed to perform any obligation of the contract. There is no obligation to drill an offset well in the circumstances of this case, according to a fair and reasonable interpretation of the contract of lease. If the contract should be annulled the plaintiff could not drill a well on his 100 acres of land, because a part of it is in one 640-acre drilling unit, on which the Lewis well is producing gas in paying quantities, and the other part of the 100 acres of land is in another 640-acre drilling unit on which a well is producing gas in paying quantities; and the plaintiff, as owner of the leased premises, is receiving the same revenue that he would be receiving if the well in Section 2 were on his 35 acres in that section, and if the well in Section 3 were on his 65 acres in that drilling unit. In other words, if the Lewis
 
 *657
 
 well were on the plaintiff’s 35 acres in Section 2 the production would be prorated among the owners of the mineral rights in the same proportion in which the production is now being divided; and if the well in Section 3 were on the plaintiff’s 65 acres the production would be distributed among all of the owners of the mineral rights in that drilling unit in the same proportion in which the production is now being distributed. Hood’s contention is that if the lease should be dissolved he would receive 35/640 of the production from the Lewis well, instead of receiving only the 1/8 royalty on the 35/640 of the gas produced from the Lewis well. And in like manner he contends that if the lease should be annulled he would receive an amount of the gas produced from the well on Section 3 that bears the same ratio to the total production that 65 bears to the number of acres in that drilling unit, instead of receiving only the 1/8 royalty on that proportion of the production from the well on that drilling unit. But the fact is that Hood transferred to the Southern Production Company the 7/8 working interest in the gas that might be produced from his 100 acres of land, for the valuable consideration of $4,000, and with full knowledge that under Act No. 157 of 1940 the Department of Conservation might establish a drilling unit for the Logansport gas field, and might thereby compel him to share ratably in the gas produced from such a unit instead of being permitted — as he was at the time of making the lease— to drill on his own 100 acres.
 

 Our conclusion is that the judgment appealed from is erroneous and should be reversed.
 

 The judgment is annulled and the plaintiff’s demand is rejected at his cost.