51 So.2d 87 (1950)
218 La. 835
EVERETT et al.
v.
PHILLIPS PETROLEUM CO.
No. 39537.
Supreme Court of Louisiana.
December 11, 1950.
Rehearing Denied February 12, 1951.
*88 Debaillon, Bailey & Mouton, Lafayette, for defendant-appellant.
Davidson & Meaux, J. J. Davidson, Jr., Lafayette, Aaron & Everett, Chas. Everett, Crowley, for plaintiff-appellee.
McCALEB, Justice.
This is a suit to recover royalties and the balance due on a bonus payable under an oil, gas and mineral lease. Plaintiffs, Frank E. Everett and J. M. Kaplan,[1] are the owners of squares and strips of land *89 of various dimensions, including an irrigation canal 100 feet wide running through the Erath Oil Field, which is located in a rice farming section of Vermilion Parish. On May 21, 1940, they granted an oil, gas and mineral lease to defendant, Phillips Petroleum Company. This lease provided, among other things, for payment of a 1/8 royalty on oil produced and saved from the land and a bonus of $15,000 to be paid out of lessee's 7/8 working interest in oil first extracted from any well drilled on the leased premises or from any well or wells drilled by lessee within a distance of 1320 feet from the nearest boundary thereof.
At the time the parties were negotiating the lease plaintiffs pointed out that, because of the unusual dimensions and characteristics of the land (irrigation canals and long, narrow strips running through a large area), it was not likely that an oil well would be drilled on the property and, for that reason, they urged that protection be given them either by offset wells or by payment of a royalty by defendant when drilling was had on other property within a certain distance from the leased premises. Therefore, it was stipulated in the contract that, if defendant did not drill on the leased premises but brought in a commercial producer on land under lease to it located within 1,320 feet of said premises, plaintiffs would be paid a royalty of 1½% of defendant's interest in the production of the well until such time as defendant obtained production from the leased property.
In addition, plaintiffs insisted that they be safeguarded by the drilling of offset wells in the event of production from lands not under lease to defendant adjoining the canal strips. In providing for this contingency, the parties agreed that defendant would be bound to drill all wells necessary to offset producing wells on adjoining lands under lease to others when such wells were within 670 feet from the nearest boundary line of the canal lands or, in lieu thereof, defendant might pay, as royalty, 1½% of the value of the production from such wells "provided, however, such offset royalty payment of 1½% shall continue only until Lessee shall commence operations for the drilling of a well under this lease offsetting any such producing well, or until Lessee shall commence operations for the drilling of an offset well under a lease owned by it."
The lease, which was confected a month or so before the passage of Act No. 157 of 1940, LSA-RS 30:2 et seq. (the comprehensive conservation measure providing for integration and unitization of oil lands in order to prevent waste and the drilling of unnecessary wells), makes no provision whatever for the pooling or integration of the canal lands with other property notwithstanding that, under the then applicable law, Act No. 225 of 1936, such pooling or unitization of oil lands was authorized.
In 1942, following the discovery of the Erath Oil Field, the various interested oil companies petitioned the Commissioner of Conservation for a unitization of all substances found at a depth of 8000 feet or below. After a hearing, the Commissioner ruled (Order No. 34-A) that the field be integrated as to the 8000 foot sand and below and that a unitization agreement of the various royalty owners, which had been prepared, be approved. Plaintiffs appeared at this hearing and objected to the unitization of the field on the ground that their rights under the lease with defendant would be affected and the Commissioner ruled that the objection presented a contractual issue "which, if not amicably settled, requires judicial determination" beyond his authority. Thereafter, plaintiffs and defendant compromised their differences and plaintiffs signed the royalty owners' unitization agreement as to the 8000 foot sands upon receiving from defendant $13,333.33.[2]
*90 On October 24, 1944, the Department of Conservation issued Order No. 34-D enacting rules and regulations governing production of oil and gas from the 7300 and 7700 foot sands of the Erath Oil Field. In this order, which stemmed from the Commissioner's own investigation, it was found, as a result of evidence adduced at a public hearing, that special rules were required for development of these sands for the purpose of conserving the natural resources of the State, to prevent waste and to avoid the drilling of unnecessary wells; that a drilling pattern be established of one well to each regular governmental unit of approximately 40 acres; that the acreage be allocated on this basis and that every well drilled on each unit be placed in the center of the Northwest 10 acres thereof.
On March 27, 1945, defendant applied to the Commissioner for an integration order affecting separately owned tracts in Unit 16 of the Erath Oil Field, being the NE¼ of the NE¼ of Section 20, T. 13 S., R. 4 E. and comprising 3.06 acres of the canal tract and 37.49 acres belonging to Mrs. Annie Fitzsimmons, under lease to defendant. These petitions were opposed by plaintiffs but the Commissioner, nevertheless, entered orders (Orders Nos. 34-D-10 and 34-D-11) integrating the respective acreage into one unit and declared that the objections of plaintiff presented a contractual issue requiring judicial determination.[3]
Meanwhile, on March 15, 1945, defendant had petitioned the Commissioner for a permit to drill a well upon the 40 acre unit comprising the NE¼ of the NE¼ of Section 20 and had requested that Order No. 34-D, providing for the location of such well in the center of the northwest 10 acres of the unit, be amended so as to allow the well to be drilled at a point 330 feet south and 330 feet west of the northeast corner of Section 20. After hearing evidence, the Commissioner approved the relocation of the well being of the opinion that a well placed in accordance with the provisions of Order No. 34-D would not adequately drain the 40 acre unit, whereas a well drilled at the point suggested by defendant would produce a full recovery of the reservoir content of the 7,700 foot sand.
Prior to the issuance of the permit to defendant to drill a well on the NE¼ of the NE¼ of Section 20 comprising the canal lands and those of Mrs. Fitzsimmons, the Tidewater Associated Oil Company, having a lease on property owned by E. B. Landry, et als. in the SE¼ of the SE¼ of Section 17 (in which 40 acres was included a 100 foot square belonging to plaintiffs under lease to defendant), made request for a permit to drill a well in that quarter quarter section in which it expressed its desire to place said well in the center of the southeast 10 acres of the unit instead of the center of the northwest 10 acres, as required by Order 34-D of the Commissioner of Conservation. After consideration of evidence adduced at a public hearing, the Commissioner granted the application (Order No. 34-D-5) and, on March 8, 1945, Tidewater completed a producing well at the location designated in the order. This well is situated within 670 feet from plaintiffs' 100 foot square located in the SE¼ of the SE¼ of Section 17 and also within that distance from the northern boundary of plaintiffs' canal lands in the NE¼ of the NE¼ of Section 20.
On March 27, 1945, defendant commenced operations for its Fitzsimmons well on the 40 acre unit in Section 20 in accordance with Order No. 34-D-12 and *91 thereafter brought in a commercial producer. Whereupon, plaintiffs made the following claims:
1. A royalty of 1½% of defendant's interest in production from the Fitzsimmons well inasmuch as that well is within 1,320 feet of the canal strip and no development of their property by drilling has been commenced by defendant.
2. A royalty of 1½% of the value of production of the well drilled by Tidewater on the 40 acre tract comprising the SE¼ of the SE¼ of Section 17from the commencement of said production until the beginning of drilling operations on an offset well, as required by the lease contract, forasmuch as the Tidewater well is within 670 feet of their 100 foot square of land under lease to defendant in the SE¼ of the SE¼ of Section 17 and also within that distance from the northern boundary of the canal strip in the NE¼ of the NE¼ of Section 20, and
3. Recovery of $1,382.34, being the balance due by defendant on the bonus of $15,000, payable out of oil production, as provided for in the lease.
The defendant resisted the demands on the ground that the orders of the Commissioner of Conservation had superseded the provisions of the lease; that, under those orders, the drilling of a well on any portion of the 40 acres comprising the NE¼ of the NE¼ of Section 20 constituted drilling upon plaintiffs' property even though the well was not situated thereon and that, therefore, the provisions of the lease, respecting the drilling of offset wells and payment of a 1½% royalty out of production in lieu thereof, were inappropriate. It further asserted that the same result obtained in respect of the Tidewater well, contending that the order of the Conservation Commissioner nullified the contractual obligation of drilling offset wells and, alternatively, that, in any event, plaintiffs' recovery of the 1½% royalty on Tidewater's production was limited to that procured between March 8, when production began, and March 27, 1945, when it commenced operations for its Fitzsimmons well.
In addition, defendant disclaimed liability for a balance due on the $15,000 bonus provided for in the lease maintaining that the $1,382.34 deduction from its payment to plaintiffs was proper as it represented the severance tax chargeable to them as owners of the oil.
After a trial on these issues, the district judge found for plaintiffs on their claim for the 1½% royalty of defendant's share of oil produced from the Fitzsimmons well. He also allowed them the offset royalty from the Tidewater well but limited their recovery to production had prior to March 27, 1945, when defendant commenced operations for its Fitzsimmons well. However, the judge rejected the demand for the alleged balance of the oil payment. Both litigants have appealed from the decision insofar as it adversely affects them.
The primary question for determination pertains to the legal effect of the orders of the Conservation Commissioner on the rights and obligations of the contracting parties. At the outset, it is apt to state that Act No. 157 of 1940, regulating the conservation of oil and other mineral resources of the State and empowering the Commissioner of Conservation to establish compulsory drilling units for the exploration of minerals has been held to be a valid exercise of Legislative power and, as such, does not violate any provision of either the State or Federal Constitution. Hunter Co. v. McHugh, 202 La. 97, 11 So.2d 495; Crichton v. Lee, 209 La. 561, 25 So.2d 229. And, conformable to this fundamental tenet of the plenary power of the State in the conservation of natural resources, it has been many times decided that, where private contractual rights are in conflict with the valid orders[4] of the *92 Commissioner of Conservation, the former must yield and are superseded by the latter. Hood v. Southern Production Co., 206 La. 642, 19 So.2d 336; Placid Oil Co. v. North Central Texas Oil Co., 206 La. 693, 19 So. 2d 616; Hardy v. Union Producing Co., 207 La. 138, 20 So.2d 734; Alston v. Southern Production Co., 207 La. 370, 21 So.2d 383; Hunter Co. v. Shell Oil Co., 211 La. 893, 31 So.2d 10; Hunter Co. v. Vaughn, 217 La. 459, 46 So.2d 735 and LeBlanc v. Danciger Oil & Ref. Co., La.Sup., 49 So. 2d 855, handed down on November 6th 1950 and not yet reported.
With these principles in mind, we consider the question for decision. The provision in the lease for payment of a 1½% royalty in the event of production from adjoining property under lease to defendant, when the well is within 1,320 feet of plaintiffs' lands and there has been no drilling on said lands, is obviously nothing more than a protective stipulation to insure plaintiffs against the exploitation of the minerals underlying their property, without recompense. It is in the nature of the usual provision found in oil leases for the drilling of offset wells which, of course, defendant had the right to do under the contract in contest but was not required to do because of the surface topography of the canal lands. The royalty payment, in lieu of drilling an offset well in the event of production from adjoining property, was an option accorded defendant which could be obviated by offset drilling. But these stipulations were rendered ineffective as soon as offsetting was prohibited by the Commissioner of Conservation.
The basic order of the Commissioner applicable to this case is No. 34-D in which a pattern was established for the drilling and recovery of oil from the 7,300 and 7,700 foot sands in the Erath Oil Field. It was provided in that order that the sands be developed on the basis of drilling and proration units of approximately 40 acres each and not more "than one well on each unit shall be allowed to produce from the same sand"; that, when two or more tracts of land were embraced within the drilling unit, the owners could validly agree to pool their interests; that, upon failure to agree, the Commissioner would, upon written request and after a hearing, require such owners to do so; that the oil and gas produced from any well on any unit embracing more than one separately owned tract of land be allocated and distributed among all such tracts in the proportion that the area of such tract bears to the entire area of such unit. And, Order No. 34-D-11 specially provides that plaintiffs' lands and those belonging to Mrs. Fitzsimmons be treated and considered as one unit, and "* * * drilling and production on any of the tracts included within said unit shall constitute drilling operations, drilling and production under the terms of each and every one of said leases or subleases".
The foregoing quoted provision of the order is a restatement of the language of Section 9(a) of Act No. 157 of 1940 under which the unitization by the Conservation Commissioner is authorized. Therefore, by virtue of the law and the order of the Commissioner, the drilling of the Fitzsimmons well constituted a drilling of the canal strip. It follows, then, that the provisions of the lease respecting the payment of the 1½% royalty on adjoining production was inapplicable as there was drilling on plaintiffs' land.
Counsel for plaintiffs assert that this decree of the Commissioner is purely a legal fiction which cannot destroy plaintiffs' contractual rights as the place selected by defendant for drilling the well was not in *93 anywise a conservation measure. But we think that the drilling which occurred on the unit was more than a mere fiction. It was an actual extraction of the minerals under plaintiffs' land based upon geophysical and scientific findingsfor, under the Commissioner's ruling, the Fitzsimmons well is capable of draining successfully all of the oil within the 7,700 foot sand from under plaintiffs' land. Hence, what difference, then, that the well does not stand upon plaintiffs' property? What plaintiffs contracted for was protection against the exploitation of their property without compensation in case of drilling on adjoining property. The orders of the Department of Conservation assure the protection of that contractual right by making it certain that all of the oil under plaintiffs' land within the 7700 foot sand will be recovered and they will obtain the same royalty to which they would have been entitled had the well been physically situated on their land.
The issue presented here is not novel. Indeed, this court has passed on it on several occasions adversely to plaintiffs' claim. See authorities cited above. A brief consideration of one or two of those adjudications will suffice, we think, to demonstrate the unsoundness of plaintiffs' contention.
In Hood v. Southern Production Co., supra, the question was whether the lessee oil company was relieved of the contractual obligation to drill an offset well where the leased premises formed part of a 640 acre drilling unit and there was a gas well located within the unit which was considered by the Commissioner as sufficient to drain the leased premises. In contending that the oil company had breached the obligation of the contract of lease, plaintiff relied upon the doctrine that, where the obligation is rendered impossible by the adoption of a prohibitory law (order of the Department of Conservation), the contract is dissolved and the parties are restored to the situation in which they would be had not the contract been made. In rejecting this argument the court, after observing that production from the well within the drilling unit rendered inoperative the provision requiring drilling of offset wells, declared: "But that doctrine is not applicable to this case because the defendant in reality has not failed to perform any obligation of the contract. There is no obligation to drill an offset well in the circumstances of this case, according to a fair and reasonable interpretation of the contract of lease. If the contract should be annulled the plaintiff could not drill a well on his 100 acres of land, because a part of it is in one 640-acre drilling unit, on which the Lewis well is producing gas in paying quantities, and the other part of the 100 acres of land is in another 640-acre drilling unit on which a well is producing gas in paying quantities; and the plaintiff, as owner of the leased premises, is receiving the same revenue that he would be receiving if the well in Section 2 were on his 35 acres in that section, and if the well in Section 3 were on his 65 acres in that drilling unit." [206 La. 642, 19 So.2d 341.]
And in Hardy v. Union Producing Co., supra, where plaintiff insisted that the obligation imposed upon the lessee oil company to drill a well on the leased premises was absolute and could not be discharged by drilling on other property, although that property was unitized with the leased premises under order of the Commissioner of Conservation, the contention was again denied under the authority of Hood v. Southern Production Company, the court declaring:
"Plaintiffs' argument is not tenable because the defendants in reality have not failed to perform any obligation of their contract. There was no obligation resting upon the defendants to drill a well during the primary term of the lease in the circumstances of this case according to a reasonable interpretation of the contract.

* * * * * *
"So in this case, the clause in the lease requiring defendants to drill a well on the leased premises within the primary term of five years is not applicable where a well producing gas in paying quantities has been drilled on land within the drilling unit of which the leased land forms a part and *94 where the lessee is prohibited by orders of the Department of Conservation from drilling a well on the leased premises". [207 La. 138, 20 So.2d 737.][5]
Thus, we hold that, since, under unitization Orders Nos. 34-D and 34-D-11, the drilling of a well on any portion of the unit was effective as though a well was actually drilled on plaintiffs' land, the provision of the lease for the 1½% royalty is inapplicable.
A similar ruling is in order with respect to plaintiffs' claim for a 1½% royalty from the production of the Tidewater well situated on the Landry property in the SE¼ of the SE¼ of Section 17, within 670 feet of plaintiffs 100 foot square of land located therein and also within that distance from the northern boundary of the canal strip in the NE¼ of the NE¼ of Section 20. Plaintiffs' theory as to its right to recover the 1½% royalty on the Tidewater production is a dual one. It is first said that, inasmuch as the Tidewater well is within 670 feet of the canal strip, the royalty is due as it was payable in lieu of defendant's obligation to drill an offset well either on the canal property or upon other property under lease to it.
We believe this contention to be untenable because the payment contemplated was only in lieu of the drilling of an offset well and, since defendant was prohibited from drilling offset wells by the conservation order communizing the entire oil field, the royalty payment is not enforceable. It seems plain that the parties were under the belief, at the time the lease was confected, that the drilling of a well on adjoining lands under lease to others within 670 feet of plaintiffs' lands would tend to drain the oil reservoir under their lands and that, therefore, offsetting wells were necessary. However, in Order No. 34-D, which had the effect of unitizing all lands for drilling purposes, see Placid Oil Co. v. North Central Texas Oil Co., 206 La. 693, 19 So.2d 616, the Commissioner determined, as a matter of fact, that one well for each 40 acre governmental section would adequately drain the oil reservoir under the land in each unit. Thus, the order had the legal effect of prohibiting the drilling of offset wells forasmuch as the only well which could be drilled in each unitized quarter quarter section would be a well which would drain the oil from all of the property under the unit. Accordingly, defendant had no right to drill a well to offset production in another unitized area, in this case the area being the SE¼ of the SE¼ of Section 17.
Plaintiffs also assert claim for the royalty by reason of ownership of the 100 foot square of land located in the SE¼ of the SE¼ of Section 17 leased to defendant. But that contention is not sustainable as this parcel is part of the 40 acre drilling unit which has been created by the Department of Conservation in its Order No. 34-D. Therefore, the drilling of the Tidewater well, even in the absence of a specific order of forced pooling, see Placid Oil Co. v. North Central Texas Oil Co. supra, was effective as a drilling upon the 100 foot square and plaintiffs are entitled, under Order 34-D and Section 9 (a) of Act No. 157 of 1940, to recover from Tidewater their proportionate share of the total production in accordance with the acreage they own. Therefore, since the output of production from the Tidewater well includes the production from plaintiffs' 100 foot *95 square, the provision of the lease respecting the 1½% in lieu royalty is irrelevant.
Finally, we come to consider plaintiffs' appeal from that part of the judgment denying them recovery of $1382.34, allegedly the balance due on the $15,000 bonus payable by defendant. The lease provides: "3. Notwithstanding in this lease to the contrary, Lessor, its assigns and successors in interest, shall receive, as additional consideration for this lease, one-eighth (1/8) of the lessee's seven-eighths (7/8) working interest oil first produced and saved from the well or wells that may be drilled on said canal lands hereby leased and/or from any well or wells that may be drilled by Lessee within a distance of 1320 feet from the nearest boundary line of said canal lands, if, as and when such oil shall be produced and saved, free and clear of all costs of development or operation, until there shall have been produced and saved to the credit of said fractional part of the oil the market value of Fifteen Thousand Dollars ($15,000.00) at the current market price at the time of production, whereupon said fractional interest in the oil and proceeds thereof shall become vested in Lessee * * *". (Italics ours.)
At the time defendant accounted to plaintiff for the bonus above stipulated, it deducted therefrom the sum of $1382.34 for severance taxes which it claims to have paid the State of Louisiana on plaintiffs' behalf. It is said by defense counsel that plaintiffs owed the severance tax under Section 21 of Article 10 of the Constitution and the jurisprudence relating thereto[6] inasmuch as they were the owners of the oil at the time it was taken from the soil. In support of this contention, counsel refer to the above quoted provision of the contract and particularly stress the language used therein that the payment is one-eighth of defendant's seven-eighths working interest in oil first produced and saved and that, when the fractional part of the oil amounts to $15,000, then said fractional interest shall become vested in defendant. It is on this difference of language contained in the leases that counsel seek to distinguish this case from the force and effect of our decision in Texas Company v. Fontenot, 200 La. 753, 8 So.2d 689 wherein it was held that under an agreement to pay $50,000 out of ¼ of 7/8 of first oil produced and saved, the lessee was obligated to pay the full $50,000 bonus and could not deduct therefrom the severance tax.
While it is true that the language of the contract in the Texas Company case specifically provided for the payment of $50,000 out of oil, whereas, in the instant case, the language refers to the payment of a 1/8 of lessee's 7/8 interest in oil first produced, we think that a fair reading of the entire clause compels the same conclusion reached in that matter forasmuch as the provision plainly displays a contractual intention that the plaintiffs are to receive the full sum of $15,000 as a bonus for the lease. It will be noted that the clause sets forth that the 1/8 of the 7/8 working interest shall be free of cost of development or operation and shall be accumulated until there shall have been produced and saved to the credit of said fractional part of the oil "the market value of Fifteen Thousand Dollars ($15,000.00) at the current market price at the time of production * * *". Thus, this language denotes that plaintiffs are to be paid in oil having a market value of $15,000not less the severance taxbecause the oil, burdened with the severance tax, would not have a market value of $15,000. Since the severance tax had to be paid at the time the oil was taken from the land, oil having a market value of $15,000 means oil that can be sold on the market for that price, obviously not oil upon which a severance tax is due.
The judgment appealed from is reversed and it is now ordered that there be judgment in favor of plaintiffs for the sum of $1,382.34 with legal interest thereon from January 10, 1945 until paid. In all other respects, plaintiffs' demands are rejected. The costs of these appeals are to be borne *96 equally by the adverse parties, other costs are to be paid by defendant.
HAMITER, J., dissents in part, assigning written reasons.
HAMITER, Justice (dissenting in part).
I disagree with that part of the decision which denies to plaintiffs recovery of the contracted royalty of 1½% of defendant's interest from the Fitzsimmons well.
In the agreement between the litigants it was stipulated that if the defendant did not drill on the leased premises but brought in a commercial producer on land under lease to it located within 1,320 feet of said premises, plaintiffs would be paid royalty of 1½% of defendant's interest in the production of the well until such time as defendant obtained production from plaintiffs' property. But according to the majority opinion this contract provision has been rendered ineffective by the unitization orders of the Conservation Department, along with the drilling of the Fitzsimmons well, under the authority of the several cited cases decided by this court which announce the doctrine that where private contractual rights are in conflict with the valid orders of the Commissioner the former must yield and are superseded by the latter.
The reason for or theory of the decision in each of the cited cases, as I appreciate those authorities, was that the conflicting and superseding valid order of the Commissioner prevented the lessee from carrying out his agreement and, as a consequence, rendered it inoperative. In the instant case, however, the defendant has not shown that it has been prevented by a Department of Conservation order from fulfilling the above mentioned provision of its lease. Defendant's well on the Fitzsimmons tract, located within 1,320 feet of plaintiffs' premises, was not drilled until after the issuance of the unitization orders of the Commissioner; and it cannot be said with certainty that the latter would have denied to defendant permission to drill such well (only one was authorized for the unit) on plaintiffs' property had application therefor been made (this was not done). If defendant had applied for such permission (as it was authorized by law to do) and had obtained it, a complete compliance with the lease provision in question could have been accomplished.
NOTES
[1] The other plaintiff, A. A. Lejeune, is owner of a ¼ mineral interest in the lands.
[2] The royalty owners' unitization agreement and the compromise by which plaintiffs acceded thereto, relating to substances found at a depth of 8,000 feet and below, are without pertinence to the issues presented in this litigation which is confined to a determination of respective rights as to the 7,700 foot sand.
[3] It is contended by counsel for plaintiffs that the refusal of the Commissioner to pass on plaintiffs' objections, inasmuch as they presented a contractual issue requiring judicial determination, makes it manifest that the integration order was not intended to affect the rights of the parties under the lease. This proposition is not substantial for the simple reason that the Commissioner's orders, which prohibit the drilling of more than one well on the unitized land and decree that production on any one of the tracts included therein "shall constitute drilling operations, under the terms of each and every one of said leases or sub-leases", effect a change in the contractual rights of the parties.
[4] Alternatively, counsel for plaintiff assert that, if the orders of the Department of Conservation are found to be in conflict with the provisions of the lease, then they are illegal, confiscatory and impair the obligation of an existing contract as they "were based entirely on testimony which was given to the Commission which was misleading, and clearly and patently did not conform with the facts existing at the time". There is no merit whatever in this attack for, as shown above, Act No. 157 of 1940 has been sustained as to all constitutional challenges. And, insofar as concerns the claim that the Commissioner's orders are based on misleading evidence, counsel cannot, in this proceeding, assail those orders which are prima facie valid. The remedy, where it is contended that the Commissioner's action is arbitrary, is to obtain court review in a suit for an injunction against the Commissioner after all administrative remedies have been exhausted. See Section 11 of Act No. 157 of 1940 and O'Meara v. Union Oil Co. of California, 212 La. 745, 33 So.2d 506.
[5] In the Hardy case, it was contended that the decision of the United States Circuit Court of Appeals for the Fifth Circuit in Dillon v. Holcomb, 110 F.2d 610, was controlling. The Dillon case, upon which plaintiffs in this case strongly rely, involved an overriding royalty and for that reason it was found to be inappropriate in the Hardy case and for the same reason it is not authority for the result to be reached here. The court, in the Hardy case, after stating that the Dillon case was inapposite to the question under consideration, observed: "In the present case, there is no question of an overriding royalty. The only question here is whether the lease was maintained in full force and effect by virtue of the production of gas in paying quantities from the unit established during the primary term of the lease by orders Nos. 28-C and 28-C-6 issued by the Commissioner of Conservation."
[6] Wright v. Imperial Oil & Gas Products Co., 177 La. 482, 148 So. 685; Sartor v. United Gas Public Service Co., 186 La. 555, 173 So. 103 and Texas Company v. Fontenot. 200 La. 753, 8 So.2d 589.