Lloyd D. SAVOY

v.

TIDEWATER OIL COMPANY.

No. 8515.

United States District Court
W. D. Louisiana,
Lafayette Division.

May 10, 1963.

Duncan M. Smith, Jr., Lafayette, La., for plaintiff.

608

Liskow & Lewis, Robert T. Jorden, and Charles C. Gremillion, New Orleans, La., for defendant.

PUTNAM, District Judge.

 Plaintiff seeks cancellation of an oil, gas and mineral lease affecting approximately twenty acres of land owned by him in Vermilion Parish, Louisiana. The case has been removed to this court under the diversity statute. While there is no evidence before us as to the value of the lease, royalty payments made for production therefrom and damages claimed of $3800.00 leave no doubt but what such value is in excess of $10,000.00. We conclude, therefore, that we have jurisdiction.

Defendant, Tidewater, has filed a motion for summary judgment which we feel should be granted. There is no dispute as to any material fact. The record reflects substantially the following history of the relationship between these parties:

The lease in question was originally granted to Fred I. Benson as lessee, and subsequently assigned to Tidewater. It was for a primary term of five years from its date, which was September 16, 1953, with the usual provision that it would continue in effect so long thereafter as production of oil, gas or other minerals, in paying quantities, is maintained or drilling operations are conducted either on the land covered by the lease or on lands pooled therewith. Delay rentals were paid through the year 1957, when it was placed in one of the gas units producing from what is known as the School Board West Sand, in the Erath Field. Payments of royalties for such gas have continued from that time to the present, and during the period from April 1, 1960 to April 1, 1961, such royalties amounted to $1172.59.

On April 1, 1958, temporary drilling units were established by Order No. 34–J of the Commissioner of Conservation of the State of Louisiana, for production of oil from a newly discovered sand called the Broussard Sand. Plaintiff's land was placed in temporary Unit B–6, the unit well was successful and plaintiff began to receive royalties resulting from this production. Thereafter the Commissioner issued two more orders affecting the Broussard Sand and this property. Order No. 34–J–2, issued April 1, 1960, dissolved the temporary units formed by Order No. 34–J, and established permanent units, placing plaintiff's land in Unit B–7, which was produced by a different unit well from the well producing Unit B–6. Order No. 34–J–3, issued on April 1, 1961, dissolved all permanent units and established a fieldwide unit to produce the entire Broussard Sand reservoir.

All of the Orders of the Louisiana Commissioner of Conservation were brought about by written application made by defendant Tidewater to the Commissioner, and all of them substantially embody defendant's recommendations as to size and location of the units thereafter created. In each instance a hearing was held by the Commissioner, all interested parties were notified thereof and were afforded ample opportunity to appear and to present evidence touching upon the subject matter of the inquiry. Plaintiff attended the hearing which was held preceding the issuance of Order No. 34–J–2, dated April 1, 1960, the record of which hearing has been filed in this suit. Reference thereto reveals that he did not object to the establishing of permanent drilling units as proposed by Tidewater, did not offer evidence at the hearing nor was he represented by counsel. It was brought out by one of the members of the Commissioner's staff that the unit well for permanent Unit 7 into which plaintiff's land was placed, was nonproductive. On being questioned, defendant's geologist and engineer stated that they intended to install gas lift valves to eliminate salt water intrusion into this well and place it back in production. After the Order was issued, this was never done, nor does it appear that Tidewater ever attempted to rework the Unit 7 Well.

After formation of the permanent units, Tidewater tendered compensatory royalties in lieu of production of $370.37

per month to all landowners having property located within the boundaries of permanent Unit 7. This sum was based upon calculations made by the defendant's engineers and geologists as to the potential of the Unit 7 well, had reworking operations been carried out thereon and the well placed back into production. Plaintiff's proportionate share of such compensatory royalties as a landowner in Unit 7 amounted to $91.45 per month. This was substantially lower than the royalty which he had previously received when his land was in temporary development Unit No. 6, under the previous Order of the Commissioner. He refused to accept payment of compensatory royalty in the amount tendered.

It is established without contradiction that plaintiff's land is structurally higher than the Unit 7 Well and consequently could have been more effectively drained by the well producing on Unit 6. Plaintiff's affidavits taken from the geologist James M. Cunningham and a petroleum engineer, Richard Stienhorst, Jr., bear this out completely. But Mr. Cunningham is in substantial agreement with the geology submitted to the Commissioner at the hearing for Order No. 34–J–2, and Mr. Stienhorst states that the geological and reservoir evidence and information presented by defendant at such hearing is not controversial. Neither of these gentlemen agreed with the Commissioner's decision, based upon this geological and reservoir information, as reflected by Order No. 34–J–2. On the other hand, they do not say that Tidewater did not act as a prudent operator in tendering compensatory royalty in lieu of reworking the well on permanent Unit No. 7, nor do they say that the compensatory royalties tendered by Tidewater and calculated on the basis of this well's potential were incorrect or otherwise objectionable.

■ It is the position of plaintiff that the lease should be cancelled because Tidewater did not recommend to the Commissioner the inclusion of Mr. Savoy's land in permanent Unit No. B–6, as his experts indicate that this land can be more effectively drained by the well serving that

Unit. This argument is clearly without merit for two reasons, first, the plaintiff did not exhaust his administrative remedies at the Commissioner's hearing, he offered no evidence, made no objection nor did he take any other action at that time to bring the matter into focus as provided by the Louisiana Statute in question, LSA–R.S. 30:1, 30:6, and secondly, because the decision made as a result of the information submitted at the hearing is the decision of the Commissioner, and not the defendant Tidewater, and as such it is not subject to collateral attack. LSA–R.S. 30:12. O'Meara v. Union Oil Company, 212 La. 745, 33 So.2d 506 (1947); Everett v. Phillips Company, 218 La. 835, 51 So.2d 87 (1950); Simmons v. Pure Oil Co., 241 La. 592, 129 So.2d 786 (1961); Smith v. Carter Oil Company, D. C., 104 F.Supp. 463 (1952). The fact that another decision might have been reached by the Commissioner that would have been more advantageous to petitioner is of no moment.

■ The rights of these parties flowing from the contract of lease, whether their obligations be express or implied, insofar as they conflict with valid orders of the Commissioner pursuant to LSA–R.S. 30:1–30:20, are superseded by the latter and are subject thereto. Everett v. Phillips Petroleum Co., supra, 51 So.2d pp. 91, 92, and cases cited therein. The recent decision of McDonald v. Grande Corp., 148 So.2d 441 (La.App. 3rd, 1963) is completely inapposite here, as in that case the Court had for consideration the effect of voluntary pooling units formed by the parties pursuant to their contract of lease.

The conclusion reached above disposes of all of the issues presented by this complaint, but, assuming the position most favorable to plaintiff, and considering that Tidewater's calculations of compensatory royalties were incorrect and that the well on Unit 7 would have produced more minerals and paid more royalty had it been reworked, and the failure to do so was a breach of defendant's implied obligation to reasonably develop the property for the mutual advantage of lessor and lessee as

is required by Louisiana law,[1] and assuming further that the property was in fact drained by the well on Unit B–6 during the period from April 1, 1960 to April 1, 1961, plaintiff still cannot prevail in this action.

■ It is settled law in this State that the breach of an implied obligation in an oil, gas and mineral lease on part of the lessee is a passive breach only, and before recision or cancellation can be demanded, the obligation must be fixed or made final, so to speak, by placing the lessee in default. See Pipes v. Payne, 156 La. 791, 101 So. 144 (1924); LSA:–C.C. arts. 1911, 1912, 1933. The cases following Pipes in Louisiana are legion.

This requirement is a condition precedent to the bringing of suit in such cases. It results from the codal provisions above cited, as interpreted and applied by the courts of Louisiana. It is completely independent of the lease provisions set out in paragraph 11 of the contract now before us [2] requiring notice of default to be given lessee for breach of the lease obligations. These contractual provisions apply only during the primary term and do not refer to the lessee's obligations under the lease after expiration of such primary term. [See: Logan v. Blaxton, 71 So.2d 675 (La.App.1954) Taylor v. Buttram, 111 So.2d 576 (La. App.1959)].

■■ In order to place the defendant Tidewater in default in this case, it was necessary for Mr. Savoy to call upon them to perform the obligations in question, to point out the particulars in which they were deemed deficient. The only action taken by him in this regard was the letter of July 2, 1960, which we do not consider to be sufficient for this purpose. The letter in question was written to the defendant's representative after the offer for payment of compensatory royalties was made to plaintiff. In it, Mr. Savoy stated that he was not satisfied with the amount of the royalty offered to him as it was small in comparison to the amount he had been receiving while his land was in temporary Unit B–6, and further, it did not insure to him his just and equitable share of the contents of the Broussard Sand reservoir, that his loss would be greater than the rest of the property owners in Unit B–7, as the reservoir capacity of the Unit was concentrated mostly under his acreage. He did not call upon Tidewater to rework the well on Unit B–7, or to do any other thing to prevent drainage of his property, but rather he concluded by asking the defendant to reconsider its offer of payment of compensatory royalty in the name of "fairness and good relations", the entire sense of this letter being that he should be paid more than $91.45 per month. We have no doubt that had defendant acquiesced in his demand for increased royalty payment this suit would never have been filed. At that time and throughout the period in question after the formation of permanent drilling units and the issuance of Conservation Order No. 34–J–2, Tidewater was engaged in assembling information, drilling additional wells in the Broussard Sand reservoir and making further studies with a view of instituting a fieldwide reservoir unit, which plaintiff knew was in the making. We note here that when the fieldwide unit was finally created and established by Order No. 34–J–3, plaintiff agreed to same and readily acknowledges that the sand is now being effectively produced to the advantage of all parties interested.

In reaching the conclusion that the plaintiff failed to put defendant in default we have not overlooked the letter written

1. This implied obligation is firmly rooted in the jurisprudence. See discussions in 27 T.L.R. 353, p. 358; 1 Loyola L.R. 1, Walker, Implied Drilling Obligations.

2. Paragraph 11 is as follows: "In the event that Lessor at any time considers that operations are not being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if legally required to conduct operations in order to maintain the lease in force, shall have sixty (60) days after receipt of such notice in which to commence the necessary operations to comply with the requirements hereof."

by his attorney demanding cancellation of the lease now before us. We note, however, that this letter was written after the period for performance of the implied obligations above-mentioned had passed, and after the land had been placed in the fieldwide unit.

We conclude that the motion for summary judgment should be and it is hereby granted.