Ruth W. KNIGHTON, et al.

v.

TEXACO PRODUCING, INC., et al.

No. 88–2662.

United States District Court,
W.D. Louisiana,
Shreveport Division.

March 11, 1991.

T. Haller Jackson, III, Tucker, Jeter & Jackson, Shreveport, La., for Ruth W. Knighton, Frank B. Treat & Son, Inc., Frank B. Treat, Jr., Josephine Treat Stacer, Margaret Treat Dickinson, Mary Brown

Giddens, Mary Duke Brown, Emily Brown Reynolds, Winston W. Brown, Hines S. Vaughan, Andrew Querbes, III, Nell Querbes Nelson, Elizabeth Gustine Welch, Marilynn Gustine Pickens, Patricia Gustine Briffa Trust, Mary Lane Phillips Risinger and Jane Phillips.

Albert Hand, Cook, Yancey, King & Galloway, Shreveport, La., for Commercial Nat. Bank in Shreveport.

John D. Fitzmorris, Jr., Robert Liles, Jr., New Orleans, La., and David Klotz, Bodenheimer, Jones, Klotz & Simmons, Shreveport, La., for Texaco, Inc.

Wiener, Weiss, Madison & Howell, James Fleet Howell and Jeffrey W. Weiss, Shreveport, La., for George G. Travis, et al.

Halpern & Daigle, Keith Daigle, Metairie, La., for Margaret W. Wilhelm.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LITTLE, District Judge.

This court is not inclined to grant the relief requested by the plaintiffs. This conclusion has been reached after scrupulous attention at a five-day trial, review of our copious notes taken contemporaneously with the testimony of the many witnesses and arguments of counsel, examination of each admitted trial exhibit, study of the post-trial briefs, research of applicable primary and secondary legal source materials including, but not limited to, the authorities cited in the post-trial briefs, and review of the trial transcript. The fact that this opinion will neither comment upon the testimony of each witness nor flyspeck every brief should not be interpreted as an act of indolence or ennui. Quite to the contrary, this court has yet to see finer or more professional productions than those promulgated by the attorneys in these cases, all of which contributed to the presentation of legal issues in an orderly fashion, all of which were thoroughly studied. One need not however dwell at length on aspects of these cases which do not require consideration as they become moot upon determination of the primary issue.

## I. The Tracts at Issue

Lodwick Lumber Company (Lodwick) owned a 640–acre tract in Bossier Parish, Louisiana. Lodwick sold one-half of the minerals in the tract to the predecessors in title of the Commercial National Bank in Shreveport (CNB) in 1934. Those predecessors in title and Lodwick then granted a mineral lease on the 640–acre tract to Bellevue Oil Corporation (Bellevue). Texaco Exploration & Production, Inc., the current mineral lessee, derived that status from the progeny of Bellevue.

Lodwick liquidated and its assets were passed to its shareholders. The assets included minerals and the Texaco lease. The present status of title to minerals to 600 feet on the 640–acre tract in Bossier Parish is not subject to question. We cannot avoid setting forth the property descriptions of the four tracts located in Bossier Parish and the stipulated ownership of minerals, to a depth of 600 feet.

*Tract 1—480 acres*

W2 of SE4; E2 of SW4; S2 of SW4 of SW4; E2 of NW4 of SW4; all of Section 10; and NW4 of NE4; NW4; and N2 of SW4 all of Section 15; all in Township 19 North, Range 11 West, Bossier Parish, Louisiana, comprising approximately 480 acres.

    Travis Group—100%

      (collectively a party defendant)

*Tract 2—40 acres*

W2 of NW4 of SW4; and N2 of SW4 of SW4; all of Section 10, Township 19 North, Range 11 West, Bossier Parish, Louisiana, comprising approximately 40 acres.

    Lodwick Group—50%

      (collectively a party plaintiff)

    Commercial National Bank in Shreveport—50%

      (a party plaintiff)

*Tract 3—80 acres*

S2 of SW4 of Section 15, Township 19 North, Range 11 West, Bossier Parish, Louisiana, comprising approximately 80 acres.

Lodwick Group—50%

(collectively a party plaintiff)

Commercial National Bank in Shreveport—50%

(a party plaintiff)

*Tract 4—40 acres*

NE4 of SE4 of Section 10, Township 19 North, Range 11 West, Bossier Parish, Louisiana, comprising approximately 40 acres.

Travis Group—50%

(collectively a party defendant)

Commercial National Bank in Shreveport—50%

(a party plaintiff)

A graphic is much more revealing.

Current Mineral Ownership of the
Bellevue - Nacatoch - Fire Flood - 2 Sand Unit (BLVU-NAC-FF-2 SU)

Tract 1, containing 480 acres:
Travis Group - 100%

Tract 2, containing 40 acres:
Lodwick - 1/2
CNB - 1/2

Tract 3, containing 30 acres:
Lodwick - 1/2
CNB - 1/2

Tract 4, containing 40 acres:
CNB - 1/2
Travis Group - 1/2

The sketch above is used by all parties and is admitted by stipulation. Joint exhibit 20.

Texaco is the target of claims by CNB, Ruth W. Knighton, et al. (the Knighton Group), and Margaret M. Wilhelm (Wilhelm). Wilhelm and the Knighton Group are sometimes referred to as the Lodwick Group. Wilhelm and the Knighton Group have also asserted a claim against George G. Travis, et al. (the Travis Group).

The crux of the plaintiffs' claim against Texaco is that Texaco has not paid a proper royalty on minerals extracted from land in Bossier Parish, Louisiana. In a nutshell, the plaintiffs assert that they should receive a royalty on producing wells located on Tract 1. The defendants, on the other hand, contend that only mineral owners in Tract 1 should receive proceeds from production on Tract 1.

Our jurisdiction over these cases is without dispute. Each is pure diversity with amounts in controversy in excess of the minimum amount. Removal was proper, consolidation was efficient.

It is not the intention of this court to pontificate in a Mitchner manner on minerals, exploration for minerals or governmental regulation of that industry. The court will, however, review some basic rules of Louisiana oil and gas law as a predicate to analyzing the case for the plaintiffs.

## II. Basic Tenets of Louisiana Oil and Gas Law

Oil and gas were first discovered in this country in the middle of the 19th century. The extent of a property owner's rights at that time was that an owner owned everything on, below, and above his property. This concept is commonly referred to as the "ad coelum doctrine." Rigid adherence to the *ad coelum* doctrine would have exposed the landowner to liability for wrongful taking of oil and gas. For example, if a fugacious mineral from Tract A crept across the property line to Tract B where it was extracted by B's owner, A would have had a claim for wrongful taking. To the same effect, if a vertical shaft well on Tract A sucked oil from a pool partially located under Tract B, then B would certainly have asserted a wrongful taking claim against the driller on Tract A.

■ To alleviate some of the problems posed by applying the *ad coelum* doctrine to fugacious minerals, a social solution much like that applied to *ferae naturae* was adopted called the rule of capture. *See generally Pierson v. Post,* 3 Cai.R. 174, 178 (N.Y.1805) (discussing pursuit of *ferae naturae*). Under this rule an owner has the right to conduct exploratory operations on his property and reduce the conquest to ownership. In so doing, no liability attaches to his actions should minerals acquired be drained from beneath the land of another mineral owner.

Louisiana recognizes the rule of capture. *See generally Correlative Rights of Parties Owning Interests in Common Source of Supply of Oil or Gas,* 17 Annual Institute on Oil & Gas Taxation 217 (1966); H. Williams, R. Maxwell, and C. Myers, *Cases and Materials on the Law of Oil & Gas* (1956); J. Lowe, *Oil & Gas Law* (2d ed. 1988); *Nunez v. Wainoco Oil & Gas Co.,*

488 So.2d 955, 960–963 (La.1986). If Louisiana had adopted the rule in an unmodified form, an owner could have drilled as many wells on his land as he cared to drill. To avoid actual or perceived drainage, however, his neighbor could have drilled as many retaliatory wells as he deemed necessary. Soon, an oil field could have become so populated with wells that a pedestrian could have traversed the entire area by walking from drilling platform to drilling platform, his feet never touching the ground.

Society would not tolerate the unbridled lust for oil and gas to dissipate a natural resource. The property owner's unlimited right to explore had to be curtailed in the name of conservation. Thus, exercising its police power to prevent waste, the Louisiana Legislature passed conservation measures that were, and are, administered by the Department of Conservation, headed by a Commissioner of Conservation.

■ The Commissioner's limited legal authority includes the capacity to require owners to pool their interests to prevent waste or to avoid the drilling of unnecessary wells in situations where waste and inefficiency would otherwise result but for the forced regimentation. The statutory authority which limits the mineral owner in unfettered uses of his interest is found in La.Rev.Stat.Ann. 30:9(B), which states:

> For the prevention of waste and to avoid the drilling of unnecessary wells, the commissioner shall establish a drilling unit or units for each pool, except for those pools which, prior to July 31, 1940, had been developed to an extent and where conditions exist making it impracticable or unreasonable to use a drilling unit at the present stage of development. A drilling unit, as contemplated herein, means the maximum area which can be efficiently and economically drained by one well. This unit shall constitute a developed area as long as a well is located thereon which is capable of producing oil or gas in paying quantities.

Clearly, the authority to restrict is limited to a situation where it is necessary to prevent mineral waste or to avoid the drilling

of unnecessary wells and applies only to a designated area which can be efficiently and economically drained by one well. The reasons for governmental intervention are specifically defined, and the power to intervene is definitely limited.

When two or more separate tracts are included in whole or in part within a drilling unit, the owners may agree to pool their interests and develop their lands on a voluntary basis. If there is no voluntary agreement, the Commissioner shall require them to do so and "develop their lands as a drilling unit, if he finds it to be necessary to prevent waste or to avoid drilling unnecessary wells...." *Id.* at 30:10. The required pooling is referred to as forced pooling.

Generally speaking, a lessor of minerals on Tract X is entitled to receive a royalty if minerals are produced from Tract X by the mineral lessee. In the same general vein, a lessor of minerals on Tract X is not entitled to receive a royalty if minerals are produced on adjacent Tract Y by the mineral lessee of Tract Y. With the foregoing as a basic doctrine of Louisiana oil and gas law, what theory of law supports the mineral lessors of Tract 2, for example, in their demand for royalties on minerals produced by wells on Tract 1? Plaintiffs claim that a *drilling unit* was created by the Commissioner of Conservation and that their properties are within the unit; thus, they should share in any production from all wells within the unit even though the producing wells in which they wish to share are not located on Tracts 2, 3 or 4.

### III. Forced Pooling

The ukase from the Commissioner captures our interpretive attention. The instrument, known as Order 196–C is the key document to plaintiffs' claims. The order is dated 25 September 1970 (Joint Exhibit 11) and creates three thermal recovery units. One of the thermal recovery units, the one with which this case is concerned, is further identified as BLVU–NAC–FF–2–SU. No language appears within the four corners of Order 196–C requiring forced pooling. No language appears indicating an area that can be efficiently and economically drained by one well. No language is contained in the instrument which would justify a conclusion that mineral leases on lands within the unit but not imprisoning the producing well would share in well production. The language of the order is complete and regular on its face and is not ambiguous. It simply does not, in this court's opinion, create a drilling unit or forced sharing of production.

■ Plaintiffs admit that Order 196–C does not contain any black letter language supporting their claim. They argue, however, that thermal unit creation brings the baggage of forced pooling with it and that nothing specific need be said.[1] That is the lesson to be learned, according to plaintiffs, from six elderly Louisiana cases: *Dillon v. Holcomb*, 110 F.2d 610 (5th Cir.1940); *Sohio Petroleum Co. v. Business and P.R.R.*, 222 La. 383, 62 So.2d 615 (La.), *appeal dismissed sub nom., Arender v. Kingwood Oil Co.*, 346 U.S. 802, 74 S.Ct. 24, 98 L.Ed. 333 (1953); *Smith v. Holt*, 223 La. 821, 67 So.2d 93 (La.1953); *Everett v. Phillips Petroleum Co.*, 218 La. 835, 51 So.2d 87 (La. 1950); *Placid Oil Co. v. North Central Texas Oil Co.*, 206 La. 693, 19 So.2d 616 (La.1944); and *Sun Oil Co. v. Stout*, 46 So.2d 151 (La.Ct.App.2d Cir.1950). We will

---

**1.** This argument is crafted to avoid the pitfalls of being classified as an impermissible collateral attack on an order of the Commissioner. This court cannot recast the Commissioner's order. It is illegal to do so under Louisiana law. Instead, an aggrieved party should seek an administrative remedy or a suit under La.Rev. Stat.Ann. 30:12. *Trahan v. Superior Oil Co.*, 700 F.2d 1004, 1020 (5th Cir.1983). Thus, plaintiffs' argue that the plain and unambiguous words of Order 196–C include unstated standards and rules as a matter of law that the rule against collateral attack is not violated.

Plaintiffs also suggest, in the alternative, that the absence of forced pooling language was caused by factual misrepresentations to the Commission by Getty Oil Company, the predecessor of defendant Texaco. Here again, we will not peer behind the Commissioner's order into the factual components upon which the Commission's order may or may not have been based. The collateral attack rule, *supra,* justifiably prevents such a foray.

not dissect each case for it is not necessary to do so as more modern authorities assist the court in its analysis of Order 196–C, a pronouncement from the Conservation Commissioner that postdates the most recent of these decisions by almost twenty years. We must observe in passing, however, that the unit orders issued by the Commissioner of Conservation in five of the six cases cited by the plaintiffs have enormous differences from Order 196–C.[2] In *Sohio*, *Smith*, and *Sun*, the controversy centered around a single 1945 order, No. 96, issued by the Commission. A copy of that very order was introduced in evidence (Texaco Exhibit 6). The language of the order specifically provides for forced pooling:

> C. The oil and gas produced from any well on any unit embracing more than one separately owned tract of land shall be allocated or distributed among all such tracts in the proportion that the area of each such tract bears to the entire area of such unit. Each such tract to which the obligations of the owner are separate, shall be considered a 'separately owned tract of land' even though a single owner may own more than one such tract.

Commissioner of Conservation Order 96, 31 May 1945. To the same effect, the *Everett* court described the order under consideration as providing for drilling units of 40 acres each, with one authorized well per drilling unit. Further, the order provided that drilling on any tract within the drilling unit would constitute drilling on all tracts within the drilling unit and sharing would result. *Everett*, 51 So.2d at 92. The *Plac-*

*id* case also resulted in a pooling and sharing decision. The order created a unitization of two 40–acre tracts with only one well authorized for the entire 80–acre tract. To limit mineral production benefits to only those mineral owners of the lease where the well was located would be unfair since the order authorized only one well to be drilled on the entire 80–acre tract.

After reading the six cases, the court is underwhelmed. Because it is the practice, custom and habit of modern Louisiana conservation commission administrative practice for the order which intends to provide forced pooling to do so specifically, former Professor George Hardy refers to an analysis of those cases as a "largely academic" exercise. Hardy, *Ruminations*, 25 La.L. Rev. 824, 838 (1965). Expert Robert T. Jordan estimated not by speculation but from the perspective of scores of years as a mineral practitioner that since 1965, some 20,000 drilling unit orders have been issued and all of them contain specific pooling language. His testimony is the most meaningful to this court.[3] Mr. Jordan testified that it was necessary to receive formal approval for implementation of secondary recovery methods contemplated by the operator in the Nacatoch sand in Bossier Parish, Louisiana. The hearing was necessary to obtain formal approval for the unique recovery operations and for some spacing guidelines for wells as they approach the competitive lease and tract lines. All this is within the authority of the Commissioner as found in La.Rev.Stat.Ann. 30:4(C)(10) which governs regulation of secondary recovery methods.

2. The unit order in the *Dillon* case is not described with precision. Its utility to this court is minimal if nonexistent.

3. Attention has been drawn to Mr. Jordan's representation of Texaco's predecessor at the Commission hearing in 1970. From that experience we are importuned by plaintiffs' counsel to disregard or discredit Mr. Jordan's testimony as he is obviously a partial observer as opposed to an impartial expert. The court disagrees. Mr. Jordan's testimony comes from the well of experience from which the Commissioner has drawn on more than one occasion. Mr. Jordan did not do any title work on the property and was engaged to obtain Commissioner creation of

thermal recovery units. He assisted in the preparation of parts of Title 30, he also assisted in drafting the rules of procedure that were adopted by the Conservation Commission in 1962. Two years later he chaired the committee that revised those rules. He was also the chairman of the 1971 committee that again revised the rules and served on the 1983 committee on a similar mission. He has been involved in 2,500 unitization Commission hearings. His experience with unitization covers both drilling units as contemplated by La.Rev.Stat.Ann. 30:9(B) and thermal drilling units as contemplated by La.Rev.Stat.Ann. 30:4.

Further, it matters not that there was one single operator for the entire unit. To suggest in such a case that forced pooling language was implicit in the unit order is inaccurate. Since 1953, the Commissioner has inserted specific language in his orders whenever his intention has been to create forced pooling. In commenting on a 1990 Louisiana Supreme Court case, *Taylor v. Woodpecker Corp.*, 562 So.2d 888 (La. 1990), (reviewing a 1942 Louisiana Conservation Commission order), Professor Patrick H. Martin noted that:

> The form of the order was somewhat different from later orders issued by the Commissioner of Conservation in that the order did not contain force-pooling language. . . .

51 La.L.Rev. 335, 375 (1990).

This court cannot find any convincing authority of an age more contemporaneous to the order date analyzed in this case (1970) that supports plaintiffs' claim for forced pooling and sharing. Evidence to the contrary, on the other hand, is most availing. After analyzing industry standards, this court has become convinced that without the language of forced pooling in a Commissioner's order forced pooling is inapplicable. Forced pooling is not implicit in the edicts from the Commissioner of Conservation. Within the mineral industry tradition, habit and custom have long established an unwritten rule of construction that forced pooling language must be explicit in an edict from the Commissioner.

Here again, we cannot demean, delimit, or deny the compelling force of the testimony of Mr. Jordan. This Louisiana mineral law practitioner of 40 years provided the *only* probative expertise concerning the Conservation Commission and the formation of La.Rev.Stat.Ann. 30:9(B) drilling units. As a practice, drilling unit designations under La.Rev.Stat.Ann. 30:9(B) are preceded by a finding as to the maximum area which can be efficiently and economically drained by one well. There must be technical evidence presented to the Commissioner and findings by the Commissioner. Those findings would define the area which can be efficiently and economically drained by one well. The parties have stipulated that as of August of 1970 there were 25 producing wells on the 640–acre tract. The unit that was created was not a La.Rev.Stat.Ann. 30:9(B) drilling unit. It was, as Mr. Jordan so vividly described, a fire flood or thermal recovery unit. The nomenclature of the unit itself identifies the unit as a fire flood unit, for BLVU–NAC–FF–2–SU means Bellevue Field, Fire Flood Nacatoch Sand.

Concisely, Mr. Jordan testifies that tradition, practice, and custom require fact findings and forced pooling language in the order from the Commission; require that a specific well location site to be designated; and require that the lands in the unit are contiguous. All are absent from Order 196–C. Order 196–C simply does not create a unit contemplated by La.Rev.Stat. Ann. 30:9(B), nor forced pooling as contemplated by La.Rev.Stat.Ann. 30:10.

What did the Commissioner create, if anything, by execution of 196–C? In answer to that question, we need only view the plain language of the order, which states that thermal recovery units were created. There is ample statutory authority for the Commissioner to establish and regulate secondary recovery methods. See La.Rev.Stat.Ann. 30:4(C)(10). There is no authority within that section, however, which authorizes the Commissioner to force pool. The specifics of forced pooling and conservation unit creation are found in La.Rev.Stat.Ann. 30:9(B) and La.Rev.Stat. Ann. 30:10. For a discussion of secondary recovery methods and the limited capacity of the Commissioner merely to regulate methods of secondary recovery, see the opinion of the late Judge Albert Tate, Jr. in *Hunter v. Hussey*, 90 So.2d 429 (La.Ct. App. 1st Cir.1956).

As of 1970, the 640–acre tract supported 25 producing wells, 15 on Tract 1 and 10 on Tract 4. It is admitted that Tract 3 is geologically sterile. Oil beneath the surface of tracts 1, 2 and 4 which is subject to detection and capture is not of the kind usually associated with the oil industry. The expert testimony of Mr. Henry C. Coutret, Jr. is elucidating and enlightening.

He describes the minerals in question as not gushing as a result of bottom hole pressure but instead having the viscosity of vaseline subject to little, if any, bottom hole pressure. A thermal or fire flood procedure is a man-made secondary recovery technique employed to increase pressure and activate the sluggish substance. By using that procedure an otherwise moribund mineral may be removed. The implementation of a fire flood process results in one well draining two acres or less. We are guided in our judgment on this matter by the excellent testimony not only of Mr. Coutret but also of Mr. David F. Hackney. Thus, many wells are used in the fire flood process. In this case, more than 440 wells have been drilled on the 640–acre tract.

The court is convinced that drilling on Tract 1 (containing 480 acres) drained no minerals from Tract 2 or Tract 4. The evidence is clear. The type of oil beneath the surface is other than peripatetic. The mineral becomes movable only by the process connected with the drilling and withdraws only the oil in the immediate area of the well. The testimony of Mr. Coutret and Mr. Hackney is instructive in that regard.

It is, therefore, our holding that Order 196–C did not create forced pooling. Minerals captured by drilling on Tract 1 need not be shared with the owners of Tracts 2, 3 and 4.

### IV. Alternate Claims

Besides arguing that the Commissioner's 1970 order created forced pooling, plaintiffs advance several alternate claims. Initially, plaintiffs claim the benefits of a "community lease." We will not discuss that issue in depth. No plaintiff has discussed it at all, and in fact, one of the plaintiffs, Commercial National Bank, even informed the court that it would not pursue the issue. The other plaintiffs did not enlighten the court by post-trial briefs as to the contours of that theory. No findings and conclusions of law are submitted by any plaintiff on that issue. The court will treat the issue as abandoned.

■ Nevertheless, we observe a lack of evidence of any intention to create a community lease. When two landowners lease their lands in one instrument to one lessee, there is no presumption that the lessors intend to share proportionally in the minerals produced irrespective of the actual site of the producing well. The parties must use specific language to obtain that result. *French v. Querbes*, 200 La. 654, 8 So.2d 631, 633 (La.1942); *United Gas Public Service Co. v. Eaton*, 153 So. 702 (La.Ct.App.2d Cir.1934).

Another theory posited by one of the plaintiffs (the Knighton Group) is that the owners of Tract 1, the Travis Group, have been unjustly enriched because those owners received royalties calculated on mineral production which was drained from the Knighton Group land. In its simplest terms, the Travis Group received funds from Texaco, part of which, according to the argument, should have been paid to the Knighton Group. The Travis Group therefore owes an amount equal to the royalties paid in error to the Knighton Group. We have determined that forced pooling is not applicable. But, if the Travis Group received more than it should have received, it didn't receive it from Knighton but from Texaco.

■ The Louisiana law on unjust enrichment is far from opaque. Knighton has an adequate remedy at law against Texaco. There is no requirement that the Travis Group pay the Knightons. The law holds that the one enriched must return the bounty to his payor. See La.Civ.Code art. 2301; *Win Oil Co., Inc. v. UPG, Inc.*, 509 So.2d 1023, 1026 (La.Ct.App.2d Cir.1987). Thus, unjust enrichment is not a remedy which is available to the Knighton Group vis-a-vis the Travis Group.

■ Equally meritless is the Travis Group's all-royalty assertion, which was raised as a defense to the forced pooling argument of the plaintiffs. When the plaintiffs' predecessor in title sold Tract 1 to Travis, it was subject to a mineral lease; the deed stated that the sale included "all ... royalties due or to become due under the terms of such lease...." That being

the case, reasons the Travis Group, the plaintiff group sold all royalties, even those to which they would have been entitled had forced pooling been applicable. In affirming that analysis, we would be reaching an absurd conclusion, contrary to the dictates of Civil Code article 2046. We hold that the meaning of the quoted language did not transfer leasehold royalty under any tract not specifically described in the transfer document.

## V. Penalties and Attorney Fees

An issue impacting but two parties to this case is also ripe for decision. Plaintiff Margaret M. Wilhelm has been paid a royalty for production from wells drilled on land in which she owned an undivided interest.[4] Wilhelm claims that she made written demand on Texaco for payment on 30 September 1986 but didn't receive payment until 21 August 1987. Texaco's tender was tardy, according to Wilhelm, as the payment must be made within 30 days after receipt of the written demand. Late payment subjects Texaco to statutory penalties and the payment of attorney fees or so the argument goes. The statutes in support of the claim are found in the Louisiana Mineral Code, La.Rev.Stat.Ann. 31:137–140.

The letter of 30 September 1986 (joint exhibit 99) is penned by Wilhelm's son, a New Orleans attorney, to the New Orleans office of Texaco. The missive is clear. The failure to pay a proper royalty is described at some length. The concluding paragraph is a demand.

> For formality sake, please consider this a formal demand for a royalty accounting pursuant to LSA–R.S. 31:136 et seq.

Joint Exhibit 99. Attorney Wilhelm followed his 30 September letter with one dated 14 October in which he reiterated the demand for payment.

> This is a formal renewal for an accounting and payment on all production which should have been paid to Mrs. Wilhelm and Mrs. Wilhelm's predecessors in title.

Joint Exhibit 100. On 29 October Texaco acknowledged receipt of the letter of 14 October and promised a response after gathering relevant information. Joint Exhibit 101.

On this issue Wilhelm's counsel offers little else than that summarized, *supra.* Review of the evidence is somewhat more illuminating. Evidently Texaco made an examination not only of the Wilhelm claim to royalties on Tract 2 but also of Wilhelm's claim to royalties on Tract 1. By letter dated 21 August 1987 (Joint Exhibit 22), Texaco communicated with George Gibson, who had replaced Jack Wilhelm as Mrs. Wilhelm's attorney. Texaco categorically, and quite properly, denied the Wilhelm claim to royalties from Tract 1. Texaco admitted that wells were drilled on Tract 2 in which Mrs. Wilhelm had a royalty interest and that her claim in that regard was acknowledged, or at least not denied. The Texaco letter, with attachments, further reports that production from the five fire flood wells on Tract 2 petered out in April of 1980. First production appeared in January of 1975. The gross royalty calculated by Texaco for Wilhelm was $2,743.55, and interest brought the total sum to $5,461.16. Texaco tendered that amount and waived its right to assert any defense of prescription.

■ We ask if the Texaco lethargy was a willful failure to pay as contemplated by La.Rev.Stat.Ann. 31:139 thus invoking the penalty of double royalty. We find the judicial definition of willfulness applied by the Louisiana court in *Bailey v. Franks Petroleum, Inc.*, 479 So.2d 563 (La.Ct.App. 1st Cir.1985) (which itself reviewed the Louisiana law on the subject of willfulness) to be instructive. The act of nonpayment by Texaco was negligent, not willful or intended. There is no evidence that the failure to pay was by design. The statute uses the permissive "may" as opposed to a mandatory "shall" when considering the application of the penalty of double the amount of royalties due. Applying the dis-

---

4. Other mineral owners have been treated similarly and appear to be content with the premise that a royalty was owed but disagree as to the method by which the amount of each payment was calculated. We leave for another day the resolution of that controversy.

cretion intended by the legislative adoption of the word may, we decline to penalize the lessee. *Wegman v. Central Transmission, Inc.,* 499 So.2d 436, 451 (La.Ct. App.2d Cir.1986), *writ denied,* 503 So.2d 478 (La.1987). It is unnecessary to award interest as interest has already been paid.

 A reasonable attorney fee, however, is in order as required by the last sentence of La.Rev.Stat.Ann. 31:139.

> In all other cases, such as mere oversight or neglect, damages shall be limited to interest on royalties computed from the due date, and a reasonable attorney's fee if such interest is not paid within thirty days of written demand therefor.

We reach this conclusion even though counsel for Wilhelm does not ask for attorney fees in his brief, submits no findings of fact as to that issue, and has directly asserted no substantive proof as to the value of the services of any attorney for Wilhelm. We have no evidence of the value of services, though we do know that services were performed by three attorneys. The statute speaks first of penalty and then of attorney fees on the interest due regardless of the cause for nonpayment. We do not find that the attorney fee portion is in the nature of a penalty for committing an intentional wrong and unlike *Dowden v. Commonwealth Life Ins.,* 407 So.2d 1355 (La.Ct.App.3d Cir.1981), a case which deals with an intentional wrong, it is necessary for there to be evidence of value of services before an award can be made. Since there is no evidence of value, Wilhelm's demand for attorney fees falls.

## VI. Prescription

The final issue is the application of the Louisiana law of liberative prescription to the plaintiffs' claims. If this court held for plaintiffs in whole or in part on any portion of their demand, then the defense of prescription, as well as the counter defense of *contra non valentem,* would have been analyzed. We are unwilling, however, to discuss in depth the defense which is rendered moot due to our holding that the main demand is flaccid.

## VII. Conclusion

In sum, this court finds that the law does not support plaintiffs' claim for an interest in production on property in which they have no interest. Order 196–C did not create a drilling unit; it created three thermal recovery units which did not provide for forced pooling since the order was not the result of La.Rev.Stat.Ann. 30:9(B) authorization.

Counsel for Texaco and the Travis Group are requested to prepare an appropriate judgment.