SARTAIN, Judge.
This is a suit to cancel from the public records an oil and gas lease by plaintiff in her representative capacity as curatrix for *16 Mrs. Nannie Sue Wilson Nabers. The grounds alleged are that the primary term has expired and there has been no production under the lease from the unit in which the leased land lies so as to extend the period of the lease. Plaintiff also seeks attorney fees and damages.
The district court following a hearing on the merits ordered the lease cancelled, granted plaintiff judgment for attorney’s fees in the amount of $4,500 but denied her claim for damages.
Defendants have appealed and assert four specific errors on the part of the trial judge. They contend that the Commissioner of Conservation of the State of Louisiana is an indispensable party to the suit because the plaintiff’s suit is a judicial attack upon his order. Defendants also complain that the suit was wrongfully instituted in a parish other than of the domicile of the Commissioner. Defendants further contend that the judgment rendered by the trial judge has the effect of modifying the “size, shape or location of a unit” and is defective because other persons affected by such modifications were not made a party to the suit. Lastly, defendants contend that the plat referred to in the description contained in the lease controls the lines and limits therein described and that the trial judge erred when he failed to accord to plaintiff’s lands the full measurements as shown on the plat.
Plaintiff answered the appeal urging the affirmation of that portion of the trial judge’s decision which ordered the lease cancelled but asking for further relief by way of increased attorney’s fees plus damages.
After a brief résumé of the facts we shall discuss the contentions of defendants and plaintiff in the order mentioned.
The lease giving rise to this litigation was executed by plaintiff on May 19, 1965 and was for a primary term of two years or as long thereafter as oil was produced thereunder. The lease was originally in favor of Sterrett Proctor but was subsequently assigned to Sun Oil Company who assigned a small interest therein to Marine Properties, Inc., a co-defendant. The property was therein described as follows:
“An undivided one-half interest in and to the oil, gas and other minerals in, on and under the following described property:
Those certain tracts or parcels of land in the Parish of Pointe Coupee, State of Louisiana, lying in and forming a portion of the W J/á of NE 14. of Section 34 and the NW-bi of Section 33, T6S, R8E, Southeastern Land District of Louisiana, and embracing 225.54 acres, and being composed of tracts designated as Lot “A” 2.10 acres, Lot “B” 69.31 acres, Lot “C” 131.04 acres and Lot “D” 7.14 acres, the land embraced in the right of way of the New Orleans, Texas and Mexico Railroad, containing 8.69 acres, with whatever title the owner may have thereto, and 7.26 acres being the additional acreage between fence lines and property lines, with whatever title the owner may have thereto, all shown on map entitled ‘Survey Map of a Portion of the Dan McDonald Wilson Property’, etc. by James R. Joffrion, C. E., dated April 26, 1962, and revised July 24, 1964, a copy of' which is annexed hereto and made a part hereof.” (Emphasis ours.)
Following a public hearing on the application of Sun Oil the Commissioner issued an order dated December 5, 1966 (effective December 1, 1966) fixing drilling units affecting the leased properties and other lands in the vicinity. The description in the order of the Commissioner pertaining to the drilling units is described as follows :
“1. The drilling and production units outlined on the plat labeled, ‘Sun Oil Company. Exhibit No. G-5 for Docket No. 66-^419,’ a copy of which is attached hereto and made a part hereof, are hereby approved and adopted as temporary drilling and production units for the W-12 Sand of the Fordoche Field, Pointe Coupee Parish, Louisiana.”
*17 The plat referred to as “Sun Oil Company-Exhibit G-5” is a plat dated October 18, 1966 of “Proposed Units W-12 Sand Fordoche Field, Pointe Coupee Parish, Louisiana, prepared by Richard C. Spikes”. This plat purports to divide Sections 31, 32, 33, 40, 41 and 42 into four equal quarter sections with each quarter section designated as a drilling unit. We are here concerned with two drilling units, namely Unit “SU-F” which is shown on the Spikes’ plat as the NW 14 of Section 33 and Unit “SU-K” which is shown on the same plat as the SW }4 of Section 33.
On February 24, 1967, prior to the expiration of the primary term of the mineral lease, Sun Oil Company commenced drilling on Unit SU-K. Drilling operations were concluded on June 22, 1967 which was after the expiration of the primary term of the lease. Defendants contend that the southerly most portion of plaintiff’s property falls within Unit SU-K and drilling operations in this unit extended the terms of plaintiff’s lease. Plaintiff was offered and refused royalty payments tendered to them by defendants on that portion of plaintiff’s property defendants argue fell within the productive unit.
The controversy between the parties stems from a difference of opinion with respect to the location of the two aforementioned units, the measurements of each, and the effect of Sun Oil Company’s Exhibit No. G-5.
Plaintiff argues that her title is limited to the NW '14 of Section 33, T6S, R8E and therefore no portion of her property is in Unit SU-K. On the other hand defendants argue that the map. attached to plaintiff’s lease shows plaintiff’s western boundary as measuring 2,640 feet and since Exhibit No. G-5 shows the western boundary of SU-F as measuing 2,618.33 feet that a portion of plaintiff’s lands .necessarily extends into the lower Unit SU-K.
The difference of opinion with respect to the measurements of this line as well as the difference of opinion with respect to the measurements of most of the lines on Exhibit No. G-5 is clearly discernible. The original governmental survey shows each of the sections depicted on Exhibit No. G-5 as measuring eighty chains on their respective east-west boundaries. Mr. Spikes testified that when he prepared Exhibit No. G-5, he found that the government survey was in error and that the various calls shown thereon would not permit the closing of the sections thereby causing a difference in the sideline measurements of the sections. That whereas the official township map called for Sections 33 and 40 to each have a measurement of eighty chains (5,280 feet) on their respective western boundaries, there was in fact a shortage of 43.34 feet. He therefore pro-rated the shortage and assigned to each section 5,236.66 feet. The mathematical result is that each quarter section contained only 2,618.33 feet or 21.67 feet short of the forty chains (2,640).
Plaintiff argues that the plat attached to the lease which called for her western boundary to measure a distance of 2,640 feet was in accord with the official township plat and clearly reflects plaintiff’s ownership of the NW 14 of Section 33. Alternatively, plaintiff urges that in the event the Spikes’ plat is accepted it would not affect the Commissioner’s order nor would it have any effect upon plaintiff’s property because plaintiff owned to the quarter section line and could not have granted a lease on property located in the SW y4 of Section 33 (Unit SU-K). In essence plaintiff’s alternative argument is that the Commissioner’s order marked the quarter section lines as the boundary between the two drilling units.
Plaintiff in support of her primary contention offered the testimony of James R. Joffrion, Civil Engineer, who made the survey and prepared the plat that is attached to the lease. Mr. Joffrion testified that he located the NW corner of Section 33 by proven and acceptable survey procedures and that because the governmental township plat called for the western bound *18 ary of Section 33 to contain a distance of eighty chains, he gave to plaintiff’s western boundary of her quarter section one-half thereof or forty chains (2,640 feet). Accordingly, he extended the line south this distance from the NW corner of the section thereby establishing the SW corner of the quarter section which is also the SW corner of plaintiff’s property. This point is also common to the NW corner of the SW(4 of Section 33 or the NW corner of Unit SU-K.
Neither Mr. Spikes nor Mr. Joffrion found any markers or monuments evidencing a previous determination of this latter corner. Both of their surveys are based on assigned distances. To repeat, Mr. Joffrion assigned a distance of forty chains (2,640 feet) as called for on the governmental township plat whereas Mr. Spikes pro-rated the alleged shortages between Sections 33 and 40 and assigned to the western boundary line of each quarter section a distance of 2,618.33 feet. This represents a difference of 21.67 feet in the measurements of the two lines.
A considerable portion of the testimony in the record pertains to the procedure each of these experts followed in conducting their respective surveys. Mr. Joffrion started from a point which he determined to be the NW corner of Section 33 and worked south. Mr. Spikes started from a point which he determined to be the SW corner of Section 40 and worked north. Each ascertained a different location on the ground for what each offered as proper and appropriate corners. Mr. Joffrion’s NW corner of Section 33 is 12.07 feet north of Mr. Spikes’ corner. Applying the distances each assigned to the western boundary line of the NW}4 of Section 33 so as to determine the SW corner of the NWJ4 of Section 33 we find that Mr. Joffrion’s corner is 9.60 feet south of Mr. Spikes’ corner. These variances equal 21.67 feet which represent the differences in the two lines as computed by these two> experts. Defendants contend that by adopting the map attached to the lease plaintiff’s property overlaps the unit boundary by 9.60 feet. This overlap according to a survey by Mr. Spikes would cause .65 acres of plaintiff’s property to be located in the SW54 or Unit SU-K.
For reasons hereinafter stated we are not called upon to' determine which of these surveys is correct and should be accepted because we are required only to determine whether or not under the particular facts of this case the lease granted by plaintiff was in fact extended by the commencement of drilling operations in Unit SU-K. Stated another way, we are called upon to determine whether or not plaintiff’s lands overlap the line prescribed by the Commissioner as the division line between the two units. If plaintiff’s lands did overlap then the lease is extended by drilling operations conducted on the lower unit. If the lands do not overlap then the lease expired according to its own terms and plaintiff was entitled to have it cancelled from the public records.
Defendants’ first three assignments of error are similar in nature and can be resolved by a determination of whether or not the order of the Commissioner of Conservation is in fact an issue in this litigation.
We agree with defendants that if plaintiff’s suit is 'in fact a judicial attack upon an order of the Commissioner of Conservation of the State of Louisiana it must be brought in the parish where the Commissioner has his principal office. LRS 30:12. O’Meara v. Union Oil Company of California, 1948, 212 La. 745, 33 So.2d 506; Simmons v. Pure Oil Company, 1961, 241 La. 592, 129 So.2d 786; Guarisco v. J. C. Trahan Drilling Contractor, Inc., 1965, 173 So.2d 304 (writs refused 247 La. 1083, 176 So.2d 143); Savoy v. Tidewater Oil Company, 1963, 218 F.Supp. 607 (affirmed by the Fifth Circuit, 326 F.2d 757).
We also agree that any proceeding resulting in a judgment affecting the size, shape or location of a drilling unit which *19 affects tracts within such unit the Commissioner is an indispensable party as are all other persons whose rights may be affected thereby. Humble Oil & Refining Company v. Jones, 1961, 241 La. 661, 130 So.2d 408.
However, the determination of whether or not the Commissioner’s order is under attack so as to require that this suit be brought in East Baton Rouge Parish against the Commissioner and all other parties that may be affected are questions of fact to be determined by the evidence in the case. Our determination of this fact coincides with the decision of the trial judge and against defendants because we do not consider this litigation an attack on the Commissoner, his order, or causing any change in the shape or size of a drilling unit.
 A mineral lease is of course affected by the order of the Commissioner of Conservation if the order of the Commissioner covers any portion of the leased lands. However, in determining whether or not certain provisions of the lease are operative the lease must be considered along with the Commissioner’s order and in considering these two instruments we find no conflict. The lease is clear that it only pertained to plaintiff’s lands lying in the NW;4. The Commissioner’s order designated the units by quarter sections. The producing well was located in the SW14.
An examination of the Commissioner’s order containing the description previously referred to hereinabove and more particularly the plat (“Sun Oil Company Exhibit No. G-5”) is clear, unambiguous and in our opinion not subject to dispute. The totality of the Commissioner’s order with the attached exhibit clearly rings forth the proposition that the Commissioner divided six sections of land located in T6S, R8E, Southeastern Land District of Louisiana, Pointe Coupee Parish, Louisiana, so that each section would be divided into four drilling units and the boundaries of these drillings units would correspond to the quarter section lines of each section.
Plaintiff’s lease contains the following provision:
“Notwithstanding anything to the contrary herein contained, drilling operations on or production from a pooled unit or units established under the provisions of Paragraph 2 hereof or otherwise embracing land covered hereby and other land shall maintain this lease in force only as to land included in such unit or units.[1] The lease may be maintained in force as to the remainder of the land in any manner herein provided for, provided that if it be by rental payment, rentals shall be payable only on the number of acres not included in such unit or units. If at or after the end of the primary term this lease is being maintained as to a part of the land by operations on or production from a pooled unit or units embracing land covered hereby and other land, Lessee shall have the right to maintain the lease as to the land not included in such unit or units by rental payments ex-cactly (sic) as if it were during the primary term provided that his right to pay rental shall terminate two years after the end of the primary term.”
Defendants argue that because a portion of plaintiff’s lands fell into Unit SU-K, defendants were privileged under the last portion of the above quoted provision to extend the lease an additional two years by paying to plaintiff proportionate rental payment on that part of the lease lands that were not within the productive unit. Plaintiff was tendered and refused this subsequent rental payment. Having concluded that no portion of plaintiff’s lands fell into the productive unit, we therefore hold that the above quoted provision of the *20 lease expired with the primary term of the lease.
Defendants’ final argument is that a plat referred to in a description of land controls the lines and limits therein described. Werk v. Leland University, 1924, 155 La. 971, 99 So. 716; Casso v. Ascension Realty Co., 1940, 195 La. 1, 196 So. 1, 130 A.L.R. 636; Meyer v. Comegys, 1920, 147 La. 851, 86 So. 307; Theriot v. Caffery, 1926, 160 La. 78, 106 So, 700; Sagrera v. Mouton, 1965, 180 So.2d 775 (writ refused 248 La. 797, 182 So.2d 73). Accordingly, defendants contend that since the plat attached to the lease provided for a depth along the western boundary of 2,640 feet (forty chains) plaintiff is bound by this description and has in fact leased to defendants property sufficient to encompass this distance. The cases cited are of course supportive of the general proposition relied upon by defendants. However, they are not applicable to or controlling of the issue presented in the case at bar because we are not dealing with a title dispute. The .65 acres which defendants contend fall into the productive unit is a portion of the 7.26 acres referred to in the property description contained in the lease which is quoted above. It should also be noted that this 7.26 acres is “additional acreage between fence lines and property lines”. The above quoted description is further qualified by the provision “with whatever title the owner may have thereto”. Thus it is clear that plaintiff intended to lease and defendants intended to acquire lease rights to “whatever title the owner (plaintiff) [2] may have thereto.”
The above property description must also be considered with other provisions of the lease, namely, Paragraph 2 which provides, inter alia:
“* * * The failure of the leasehold title (in whole or in part) to any tract or interest therein included in a pooled unit shall not affect the validity of said unit as to the tracts or interests not subject to such failure, but the unit may thereafter be revised as hereinafter provided. Lessee shall have the right and power to reduce and diminish the extent of any unit created under the terms of this paragraph so as to- eliminate from said unit any interest or lease to which title has failed or upon which there is or may be an adverse claim.”
This provision clearly gives authority to defendants to reduce and diminish the extent of any unit created voluntarily or by order of the Commissioner if here is failure in the leasehold title.
This is particularly significant in the case at bar because defendants are also the owner of mineral rights to the SW of Section 33 which is Unit SU-K. On May 16, 1961, Dan M. McDonald Wilson and Mrs. Nannie Sue Wilson Nabers executed a mineral lease in favor of Mr. Lewis Gottlieb covering property then described as 75 acres, “being composed of a part of the Southwest Quarter (SW/4) of Section Thirty-three (Section 33) * * *”. On May 17, 1965 Mr. Wilson and plaintiff, representing Mrs. Nabers, executed an act of correction which further described the property as containing 75.30 acres[3] and being more particularly described as Lot “E” as per survey and map made by James R. Joffrión. On September 3, 1965, Mr. Gottlieb transferred all of his rights under this lease to defendant, Sun Oil Company. So on this latter date we find that the same parties, namely: Mrs. Nannie Sue Wilson Nabers and Dan M. Wilson, are lessors and defendants are lessees of two contiguous tracts. These tracts are referred to as Lot “C” located in the NWJ4 of Section 33 and Lot “E” located in the SW of Section 33. Mr. Joffrion’s map is attached to each lease. The eastern boundary of Lot “E” under the Gottlieb lease shows a distance of 2,640 feet (forty chains). The Joffrion map very clearly reflects that the boundary line between *21 Lot “C” and Lot “E” is the line common to the NW!4 and the SWi/i of Section 33. Thus whatever overlap there might be as a result of the Proctor lease, the same property would be covered by the Gott-lieb lease which was in fact executed first. Defendants cannot claim lease rights under both of these leases and then be heard to repudiate one so as to acquire an added advantage as a result. Accordingly, we reiterate that for the purpose of determining the rights of the parties in this litigation with respect to the lease executed on May 19, 1965 by plaintiff in favor of Mr. Proctor and assigned to defendants, we find no merit in defendants claim that a portion of plaintiff’s property, described as Lot “C”, is in fact located in the SWj4 of Section 33. If there is a difference in measurements of property lines which we equate to a failure of title, then the last quoted section of the lease now in question would be applicable and defendants are privileged thereunder to adjust the interior measurements of property lines to conform to title.
This is undoubtedly what defendants have done for it is noted that on the survey of Sections 33 and 40 prepared by Mr. Spikes, dated September 13,. 1967, the southern boundary of plaintiff’s Lot “C” does not extend across the entire width of the productive unit. This survey was prepared to determine ownership interests and to assist in the preparation of “Oil and Gas Division Order No. 9561”. The plat shows as Tract K (7.76 acs), a parcel of land owned by Annie Laurie W. Barnes, et al. Mr. Spikes on this plat has not given to plaintiff’s Lot “C” its full 2,640 feet but has in fact cut it short by 13.12 feet by the width of the Barnes’ Tract. The same is true with respect to property belonging to Jerry V. Hawkins, shown as Tract K-4 (1.09 acs). This is supportive of our belief and holding that the lands described in the two leases do not overlap and the boundary between the two is the quarter section line.
Having agreed with the trial judge that plaintiff was entitled to have the lease in question cancelled we now turn our attention to the question of attorney’s fees and damages.
The trial judge awarded plaintiff attorney’s fees in the amount of $4,500.00. We do not find that this sum is either excessive or inadequate as urged by defendants and plaintiff respectively. The trial judge was fully acquainted with the amount of time, effort and legal skill required and in the absence of a clear showing of abuse of discretion on his part we should not amend this award.
However, defendants have taken this appeal and have caused additional work on the part of plaintiff’s attorneys. The briefs prepared by plaintiff’s attorneys and the arguments before us clearly support an increase in the amount of attorneys’ fees for the appeal and to this extent the judgment awarding attorneys’ fees should be increased by the sum of $1,000.00.
LRS 30:102 provides that in the event a lessee fails or refuses to comply with a request for cancellation of a lease within ten days, the lessee shall be liable to the lessor for any damages suffered by the latter for his inability to make a lease because of the non-cancellation. The evidence in this case shows that plaintiff was offered a new lease by persons experienced in such matters. This proffered lease contained the provision requiring exploration. The record further shows that the cost of drilling a well to the Sparta Sand would amount to $65,-000.00. This evidence remains uncontradicted. In Fite v. Miller, 192 La. 229, 187 So. 650, 122 A.L.R 446, the Supreme Court stated that the measure of damages is the value of the uncertain hope which plaintiff had in the consequence of the assurance that a well would be drilled in search of oil or gas on the leasehold in which plaintiff retained a one-half inter *22 est. The court stated that the best criterion to determine damages would be the amount that it would cost to drill the well to the depth specified. This holding was reaffirmed in the same case at 196 La. 876, 200 So. 285 and again recognized and followed in Jones v. Whittington, 171 So.2d 764 (2d La.App., 1965, Writ Refused). For these reasons we find that plaintiff is entitled to damages in the amount of $65,000.00.
For the above and foregoing reasons the judgment of the district court is affirmed insofar as the same ordered the cancellation of the lease; the judgment is amended to increase the attorneys fees from $4,500.00 to $5,500.00 as additional attorneys fees incurred as a result of this appeal; and for damages in favor of plaintiff and against the defendants in the amount of $65,000.00, together with legal interest thereon from date of judicial demand until paid and for all costs of these proceedings.
Affirmed, amended and rendered.

. Generally referred to as the “Pugh Clause”.

. Parenthesis supplied by the court.

. Should have been 75.39 acres.